# United States Court of Appeals
## For the First Circuit

Nos. 05-1800, 05-2045 and 05-2047

UNITED STATES OF AMERICA,

Appellee,

v.

DAVID SANCHEZ-BADILLO and RAYMOND MENDEZ-ECHEVARRIA,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Lynch, Chief Judge,

Lipez and Howard, Circuit Judges.

Rafael F. Castro Lang, for appellant David Sanchez-Badillo.
Raymond Rivera Esteves, for appellant Raymond Mendez-Echevarria.
Mariana E. Bauzá-Almonte, Assistant United States Attorney, with whom Rosa Emilia Rodriguez-Velez, United States Attorney and Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

August 27, 2008

**HOWARD**, **Circuit Judge**.  After a lengthy jury trial, appellants David Sanchez-Badillo ("Sanchez") and Raymond Mendez-Echevarria ("Mendez") were convicted of conspiring to distribute heroin, cocaine, cocaine base and marijuana.  Mendez was also convicted of two counts of illegal weapon possession.  They were sentenced to terms of imprisonment of 292 months and life, respectively.[1]  On appeal Mendez and Sanchez both claim that while they were charged with participating in a single conspiracy, the evidence adduced at trial demonstrated the existence of separate, independent conspiracies.  Thus, they argue, the jury's conspiracy verdict was not supported by the evidence.  Both men also claim the trial court made sentencing errors.  In addition, Mendez argues that the evidence was insufficient to support the jury's verdict against him on the weapons charges, and that prosecutorial misconduct entitles him to a new trial.  Finally, Sanchez claims that the trial judge made impermissible comments in the jury's presence, and that he was denied effective assistance of counsel. We affirm.

## I. FACTUAL BACKGROUND

We recount the facts in the light most favorable to the verdicts being appealed.  United States v. Portela, 167 F.3d 687,

---

[1]Sanchez and Mendez were among seventeen defendants named in the conspiracy indictment.  They were tried along with Francisco Muriel-Castillo, who was acquitted of the drug conspiracy charge on which he was indicted.

692 (1st Cir. 1999). The basic facts of the case are outlined first, with further details added to address particular arguments.

This case involved drug trafficking at the Los Lirios del Sur housing project ("Los Lirios") in Ponce, Puerto Rico. The government's case was based, to a large extent, on the testimony of three cooperating witnesses -- Carlos Ramon Rivera Segarra, Ferdinand Pagan Flores and Jonathan Negron Torres. According to extensive trial testimony, the central player in the drug conspiracy was one Alex Crespo-Echevarria, a/k/a Alex Gatillo ("Gatillo"), the owner of two "drug points" at Los Lirios. As owner, Gatillo collected "rent" -- generated from drug sales -- from those who ran the day-to-day operations of the drug points. Gatillo was also known to have enforced his rent collection and his territorial boundaries with both actual and threatened violence.

One of Gatillo's drug points, known as the "lower point," was located near block #10 at Los Lirios. This point was managed by appellant Sanchez, who, according to trial testimony, was known to carry a gun. The lower point trafficked primarily in heroin, as well as marijuana. In order to get the drugs to the street-level sellers, Sanchez used a "runner," Nelmaris Rodriguez, who was also responsible for collecting money from the sellers. After the sellers received their shares of sales proceeds, Rodriguez passed the balance of the proceeds on to Sanchez.

Gatillo's other Los Lirios drug point, known as the "upper point," sold marijuana and cocaine. Gatillo's involvement with the upper point dated back to 1999, when he removed the point's original owner. The point subsequently fell under the control of a rival of Gatillo's, who was driven off by death threats made by Mendez and his brother, to the benefit of Gatillo. Mendez's brother took over management of the upper point until his 2002 imprisonment, whereupon Mendez -- who had returned to Puerto Rico in 2002 after living in Florida for approximately two years -- took over.

In September 2002, a rival marijuana dealer, Felix Gelbi[2], was shot and killed in a park at Los Lirios. Negron Torres testified that he purchased marijuana from Gelbi at approximately 11 p.m. near the park, and that as he sat on some bleachers to smoke, saw Gelbi continue through the park. He further stated that as Gelbi neared a market, Mendez and others called out to Gelbi, and then fired several shots at him, killing him. A few days later, Mendez admitted to Negron Torres that he shot Gelbi in the mouth.

Mendez's involvement with the upper drug point ended when he was arrested on October 23, 2002. When he was seized by federal agents, Mendez was a passenger in a pickup truck that was leaving

---

[2]The record contains different versions of the spelling of the decedent's last name. We will use the one appearing more frequently.

-4-

Los Lirios. The agent who removed the driver from the truck saw a handgun on the front bench seat. It contained a fully-loaded magazine and a bullet in the chamber. Shortly thereafter, another agent found a second handgun under the passenger seat Mendez occupied. This gun, which was equipped with a laser sight, also had a full magazine and a round in the chamber ready to be fired.

In late September 2002, Mendez and Sanchez had been indicted for participating in a drug conspiracy, in violation of 21 U.S.C. §§ 841(a)(1) and 846. In light of the circumstances surrounding Mendez's October arrest, he was indicted again in November, for illegal possession of a firearm with an obliterated serial number, and possession of a firearm while under indictment. Also, in December, a superseding indictment was returned against Sanchez and Mendez, restating the drug charges, but adding the October weapons possessions as an overt act in furtherance of the conspiracy. Thus, in addition to the two gun charges against Mendez, he and Sanchez were accused of conspiring to knowingly and intentionally possess with intent to distribute one kilogram or more of heroin, five or more kilograms of cocaine, fifty grams or more of cocaine base, and 100 kilograms or more of marijuana.

In addition to convicting Sanchez and Mendez of the criminal charges in the indictment, the jury completed special verdict forms, in which it found Mendez responsible for possessing with intent to distribute less than 100 kilograms of marijuana,

that he was a manager of more than five conspiracy members, that he possessed weapons in furtherance of the conspiracy, and that he murdered Felix Gelbi in furtherance of the conspiracy. The jury found Sanchez responsible for thirty or more kilograms of heroin, less than 100 kilograms of marijuana, and found that he was a leader or organizer of the conspiracy.

## II.  DISCUSSION

A.  Conspiracy convictions (Mendez and Sanchez)

Both appellants argue that while the indictment alleged a single conspiracy -- playing a role in Gatillo's organization -- the facts introduced at trial proved the existence of multiple, independent conspiracies. Where, as here, there was no objection to the jury instructions, "the issue resolves into a sufficiency-of-evidence question." United States v. Soto-Beniquez, 356 F.3d 1, 18 (1st Cir. 2004) (citations omitted). Thus, we must affirm if the jury was presented with evidence sufficient to support its finding that appellants were guilty of the charged conspiracy. Id.

While we ultimately look at the totality of the evidence in determining whether a single conspiracy was proved, Portela, 167 F.3d at 696, we consider a number of factors along the way, none of which, standing alone, in necessarily determinative. These include (1) the existence of a common goal, (2) interdependence among the participants, and (3) overlap among the participants. Id. at 695; Soto-Beniquez, 356 F.3d at 18-19. It is also not necessary to

prove that "each conspirator knew of or had contact with all other members. Nor . . . that the conspirators knew all of the details of the conspiracy or participated in every act in furtherance of the conspiracy." Id. at 19 (citing United States v. Mena-Robles, 4 F.3d 1026, 1032 (1st Cir. 1993)).

Mendez concedes that the trial evidence was sufficient to support the finding of a common goal -- selling drugs for profit. See Portela, 167 F.3d at 695 ("[G]oal of selling cocaine for profit satisfies the common goal requirement."). Sanchez, however, disputes this finding, alleging that the objectives of the two drug points may have been "identical," but were not "in common." Given that we have noted the wide breadth of the "common goal" requirement, see id. at 695 n.3 (citing United States v. Richerson, 833 F.2d 1147, 1153 (5th Cir. 1987)), and the testimony that the Los Lirios drug trade was controlled by Alex Gatillo, we have little trouble finding that this conspiracy had a common goal of serving Gatillo's illicit interests.

Both appellants argue that the evidence was insufficient to prove interdependence among the participants in the conspiracy. To the contrary, we find substantial evidence of such a relationship. "Establishing interdependence among the participants requires determining whether the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme." Portela, 167 F.3d at 695. Such

-7-

interdependence "makes it reasonable to speak of a tacit understanding between [a core conspirator] and others upon whose unlawful acts" his success depends. <u>United States</u> v. <u>Glenn</u>, 828 F.2d 855, 858 (1st Cir. 1987). While Sanchez concedes that the government's evidence was sufficient to prove that he was involved with Gatillo in a different conspiracy to sell heroin and marijuana at the lower point, he maintains that his involvement was independent of the upper point and of the Gatillo organization as a whole. Mendez denies any personal involvement with Gatillo, and further contends that there was no evidence even linking Gatillo to the upper point. Mendez also argues that his absence from Puerto Rico from approximately 1999-2000 until May of 2002 commands a finding in his favor. We do not agree.

Our review of the voluminous trial record yields several pieces of evidence from which a jury could have concluded that the government established a tacit understanding among the appellants and Gatillo, as well as a cross-pollination of the two drug points. First, the testimony quite explicitly described Gatillo's iron-fisted control over Los Lirios. From that alone, the jury may have reasonably inferred that a decision to sell drugs at Los Lirios constituted a tacit agreement to join Gatillo's organization. In addition, the evidence indicated that Nelmaris Rodriguez worked for Gatillo as a runner at the lower drug point before Sanchez became manager. Thus, when Sanchez became involved with the lower point,

it was reasonable for the jury to conclude that he was knowingly linking himself with the street-level dealers that Rodriguez -- on behalf of Gatillo -- had previously used at the lower point. The jury also could have concluded that, based on her pre-existing business relationship with Gatillo, Rodriguez would serve as Gatillo's "eyes and ears" at the lower point, ensuring the point's smooth operation on Gatillo's behalf and helping Gatillo keep track of sales proceeds. Additionally, Pagan Flores testified that he had peddled drugs through Nelmaris Rodriguez at the lower point, and also served as a runner at the upper point prior to Mendez's management there. The jury also could have found interdependence from Negron Torres's testimony that he worked in the heroin distribution aspect of the lower point managed by Sanchez and later in marijuana distribution at the upper point operated by Mendez. He also testified that Mendez killed rival marijuana dealer Gelbi, an act that served to bolster Gatillo's control of the Los Lirios drug trade. Mendez was accompanied by Michael Rivera-Quinones, who had served as a runner at the upper point. Combining this with his earlier threats against Mendez's brother's predecessor at the upper point, a jury could have rationally concluded that Mendez was serving as an enforcer of Gatillo's dominance.

In addition to these examples of the ties between the appellants, Gatillo and the two drug points, evidence demonstrated that the interdependence of the drug points overseen by Gatillo

extended back as far as 1998 when Rivera-Quinones (known for his involvement with the upper point), traveling in a pickup truck with lower drug point operator Santiago Torres-Montanez, was stopped for a traffic violation. A search of the truck revealed drug paraphernalia, armor piercing bullets, and approximately $3800 in small bills held together with rubber bands. After they were brought to a local police station, appellant Sanchez (identified with the lower drug point) arrived at the police station, claiming that the vehicle and the money belonged to him. That claim was rebuffed, but Muriel-Castillo (involved in the lower point with Sanchez) was successful in claiming that both the truck and the bullets belonged to his mother. Eventually, a local judge ordered all property seized returned to Muriel-Castillo, who then divided up the returned money to pay for the lawyers representing Rivera-Quinones and Torres Montanez. From this sequence of events, in which participants in the two points were arrested together and were aided by participants in the lower point, the jury could have concluded that the two points were interdependent.

The evidence here also shows overlap among the participants. We have stated that "overlap" can be found in "the pervasive involvement of a single core conspirator, a hub character . . . ." Portela, 167 F.3d at 695. In this case, the evidence demonstrated that Gatillo was such a hub character, with those

working underneath him often serving both Los Lirios drug points, and competitors suffering harsh, or fatal, consequences.

Mendez's attempt to seek safe harbor in the fact that he was away from Puerto Rico between 2000 and May 2002 also fails. Even if he joined the conspiracy late, "as long as he did so knowingly, he is liable for the conspiracy itself and earlier acts in furtherance of the conspiracy." Soto-Beniquez, 356 F.3d at 23.

Against this factual backdrop, we find that the totality of the government's evidence was sufficient to prove the existence of a single conspiracy, and to prove appellants' knowing participation in it.

B. Weapons Convictions (Mendez)

Mendez argues that the evidence was insufficient to convict him on either of the two weapons charges lodged against him. We disagree.

Mendez was first charged with unlawful possession of a loaded, 9 mm Highpoint Firearms semi-automatic pistol that had the manufacturer's serial number obliterated, and which had been shipped or transported in interstate commerce. He claims that he neither possessed the weapon at issue nor had the requisite knowledge of the obliterated serial number.

Pursuant to 18 U.S.C. § 922(k), it is unlawful to "knowingly . . . possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or

altered and has, at any time, been shipped or transported in interstate or foreign commerce."[3]

Turning first to possession, we have noted that when Mendez was arrested, the Highpoint pistol was found on the bench seat of the pickup truck in which Mendez was a passenger. It is not necessary, however, for the government to prove that Mendez physically possessed the gun. Instead, proof of constructive possession is sufficient. United States v. Wight, 968 F.2d 1393, 1397-98 (1st Cir. 1992). "Constructive possession" is proven by demonstrating that Mendez "'knowingly had the power and intention at a given time of exercising dominion and control over a firearm . . . directly or through others.'" United States v. DeCologero, 530 F.3d 36, 67 (1st Cir. 2008) (quoting Wight, 968 F.2d at 1398). "Constructive possession can be joint," and can be extremely brief: "'a minute of possession is as much of an offense as a year of possession.'" Id. (quoting United States v. Zavala Maldonado, 23 F.3d 4, 8 (1st Cir. 1994)).

The fact that the gun was found on the bench seat is sufficient for the jury to have concluded that Mendez "had the power to exercise dominion and control over it." See United States v. Van Horn, 277 F.3d 48, 55 (1st Cir. 2002) (evidence sufficient to convict defendant of illegal possession of explosives where

---

[3]Mendez does not dispute the "interstate commerce" element of either of the weapons charges against him.

defendant sat in back seat of car adjacent to bucket of explosives.) There was additional supporting evidence, however. The Highpoint pistol had "smiley face" stickers affixed to it in the same location as another gun found at the scene to which Mendez admitted ownership. Also, the government presented expert ballistics testimony tying the Highpoint gun to evidence found at the scene of Felix Gelbi's murder. Although cross-examination of the expert revealed some potential inconsistencies in his testimony, "it is for the jury to choose between varying interpretations of the evidence." United States v. Wilder, 526 F.3d 1, 7 (1st Cir. 2008).

In addition to the possession prong of the statute, the government also had to prove that Mendez had actual knowledge of the obliterated serial number. United States v. Abernathy, 83 F.3d 17, 19 (1st Cir. 1996). Here, given the fact that the jury reasonably found that Mendez killed Gelbi with the Highpoint pistol on September 23, 2002, we cannot say that it was unreasonable for the jury to conclude that Mendez's use and continued possession of the gun until his arrest was proof of his knowledge of the obliterated serial number. Accordingly, we reject Mendez's claim with respect to the charge under section 922(k).

We need to spend little time on the second gun charge, in which Mendez was accused of violating 18 U.S.C. § 922(n) by being "a person under indictment for a crime punishable for a term

exceeding one year" and receiving a firearm or ammunition which has been shipped in interstate or foreign commerce. To begin with, a defendant's "receipt" of a firearm can be proven by his possession -- actual or constructive -- of it. See United States v. Lamare, 711 F.2d 3, 5 (1st Cir. 1983) (decided under predecessor to § 922(n)). Next, as previously noted, Mendez was originally indicted on the drug conspiracy charges in September 2002. He was arrested on October 23, 2002. Having already affirmed the jury's finding that he possessed the Highpoint pistol, we must reject any argument that Mendez was not "in receipt of a firearm" while "under indictment for a term exceeding one year." This conviction is affirmed.

C. Judge's Comments During Opening Statement (Sanchez)

During his opening statement, Sanchez's counsel stated that Sanchez had been "targeted" by the government. The judge overruled the government's objection and denied a request for a sidebar. The following exchange ensued in the jury's presence:

> Court: No. You're not going to approach the bench. It is not argument. That is he's stating that's what the evidence will show. We'll see if it does show or not. We'll see. I mean he's putting in the goods up front. At the end of the case we'll see what happens. No, that's not arguments. He is saying that is what he's going to prove. That's what the evidence is going to be.
>
> Government: He's characterizing that the government has targeted.

>           Court:  I don't know.  That's the argument.
>           That's what he's stating the evidence will
>           show.  I don't know if it will show that or
>           not.  We will see at the end of the case if
>           the goods were as he's stating them or not.
>           No.  Overruled.  Proceed.

(emphasis added).

Sanchez argues that the highlighted portion of the judge's comment improperly imposed an evidentiary burden on him. Pointing to the fact that many of the evidentiary assertions predicted by defense counsel failed to materialize, Sanchez argues that it was "probable" that the jury convicted him because he failed to meet the burden imposed by the judge. We disagree. For starters, the jury's deliberations took place approximately 34 days (22 trial days) after the comment at issue. Less obviously, but more importantly, the jury was instructed on at least two occasions that the defense is not required to produce any evidence, that the burden is always on the government to prove "each of the elements of the crime charged beyond a reasonable doubt," and that the "defendants have the right to rely upon the failure or inability of the government to establish beyond a reasonable doubt any essential elements of a crime charged against them."

As Sanchez did not contemporaneously object to the judge's comment, we review for plain error. United States v. Bailey, 405 F.3d 102, 110 (1st Cir. 2005). To vacate Sanchez's sentence for plain error, we must find that (1) there was error; (2) the error was plain and obvious; (3) the error affected

-15-

defendant's substantial rights; and (4) the error impaired the fairness, integrity, or public reputation of the judicial proceedings. United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001); see also United States v. Dominguez Benitez, 542 U.S. 74, 81-21 (2004) (defendant alleging plain error must show a reasonable probability of a different outcome in order to prove that the error "affected his substantial rights"). We have held that "a trial court has broad authority to comment during trial, and in particular, to comment in a way that will stop the jury from treating a lawyer's argument as if it were evidence." United States v. Quesada-Bonilla, 952 F.2d 597, 600 (1st Cir. 1991). While the trial judge's one-time use of the word "prove" was inadvisable, we find that it falls far short of plain error. Given the existence and timing of the various jury instructions that correctly formulated the burden of proof, we find that any error did not impair Sanchez's substantial rights and the fairness, integrity or public reputation of the judicial proceedings were not impaired.

D. Ineffective Assistance of Counsel (Sanchez)

Sanchez argues that he was deprived of his Sixth Amendment right to counsel because his lawyer refused to let him testify and made a variety of other trial blunders. At the outset, we note that "[w]e have held with a regularity bordering on the monotonous that fact-specific claims of ineffective assistance

cannot make their debut on direct review of criminal convictions, but, rather, must originally be presented to, and acted upon by, the trial court." United States v. Leahy, 473 F.3d 401, 410 (1st Cir.), cert. denied, 128 S. Ct. 374 (2007). Although an exception exists where the record is adequately developed to "permit reasoned consideration of the claim," id., the current record is lacking details of the reasons behind defense counsel's various strategic decisions complained of here. As such, Sanchez must pursue such remedies, if they are warranted, via 28 U.S.C. § 2255.

E. Prosecutorial Misconduct / Curative Instruction (Mendez)

Mendez makes two related arguments stemming from a prosecutor's misstatement during closing argument. During his rebuttal, the prosecutor erroneously told the jury that the "weapons" seized from the truck during Mendez's arrest were connected to Gelbi's murder. The use of the plural was incorrect, as only one of the two guns could be forensically tied to the crime scene. This was the only misstatement alleged by Mendez. It was soon followed by a curative instruction from the trial judge, in which he clarified that the singular tense should have been used, but unfortunately misidentified which of the two seized guns was connected to the crime scene. Mendez claims that either of these errors warrant a new trial. We disagree.

Whether a new trial should have been ordered is reviewed for abuse of discretion. United States v. Riccio, 529 F.3d 40, 45

-17-

(1st Cir. 2008). Here, while the prosecutor's comment was undoubtedly inaccurate, there is also no dispute that this was an isolated remark and that the use of the plural -- "guns" -- was quickly corrected. We find neither an attempt to mislead the jury nor a likelihood that the jury was misled. Thus, no new trial was warranted. See United States v. Azubike, 504 F.3d 30, 39 (1st Cir. 2007) (new trial warranted only where prosecutor's misconduct so poisoned the well that the trial's outcome was likely affected).

Mendez did not object to the district court's curative instruction, thus we review only for plain error. See United States v. Bailey, 405 F.3d 102, 110 (1st Cir. 2005). We find none. In the first instance, defense counsel quickly pointed out and corrected the court's error. Also, given the witness testimony connecting Mendez to the murder, the error, if any, neither affected Mendez's rights, nor affected the outcome. See United States v. Martinez-Vives, 475 F.3d 48, 52 (1st Cir. 2007). Finally, the district court reminded the jurors that it was their recollection of the trial evidence which controlled, and not the representations of the evidence made at closing argument. In our view, this was sufficient to remove any conceivable taint, the existence of which we doubt in the first place. See United States v. Allen, 469 F.3d 11, 16 (1st Cir. 2006), cert. denied, 128 S. Ct. 41 (2007).

F.  Sentencing

        1.  Sanchez

        Sanchez's sole sentencing argument is that the district court made erroneous drug quantity calculations that led to an improper sentence.  As previously noted, Sanchez was sentenced, following a two-day hearing, to 292 months' imprisonment.  The trial court arrived at this sentence by attributing thirty kilograms or more of heroin to Sanchez, for a base offense level of thirty-eight.  The judge added two levels for Sanchez's role as a leader and organizer for a total offense level of forty,[4] which combined with a criminal history category of I to yield a guideline range of 292-395 months.  After considering the factors enumerated in 18 U.S.C. § 3553(a), including Sanchez's status as a first-time offender, and the lack of other aggravating factors, sentence was imposed at the lowest point in the range.

        We review claims of legal error de novo.  United States v. Goodhue, 486 F.3d 52, 55 (1st Cir. 2007).  The trial court's factual findings -- including those related to drug quantity calculations -- are reviewed for clear error.  United States v. Marks, 365 F.3d 101, 105 (1st. Cir 2004).

        At the outset, we reject Sanchez's claim that the drug quantity calculation must be proven beyond a reasonable doubt, pursuant to Blakely v. Washington, 542 U.S. 296 (2004), so long as

---

[4]Sanchez does not appeal the "leader or organizer" increase.

the resulting sentence does not exceed the statutory maximum based on the facts found by the jury."  United States v. Gonzalez-Velez, 466 F.3d 27, 40 (1st Cir. 2006).  The sentencing judge was permitted to determine facts under the Guidelines by a preponderance of the evidence.  See United States v. Yeje-Cabrera, 430 F.3d 1, 17 (1st Cir. 2005); United States v. Antonakopoulos, 399 F.3d 68, 75 (1st Cir. 2005).[5]

The applicable statutory maximum sentence in a drug conspiracy case is determined from a "conspiracy-wide perspective." United States v. Colon-Solis, 354 F.3d 101, 103 (1st Cir. 2004) (citation omitted).[6]  The court, however, may not automatically shift the drug quantity attributable to the conspiracy as a whole to an individual defendant.  Id.  Instead a defendant-specific determination of drug quantity is required for an individual's sentence.  Id.  In so doing, "the court is required to make an

[5]The trial in this case having taken place in the interregnum between Blakely and United States v. Booker, 543 U.S. 220 (2005), the district court submitted the drug calculation and leader / organizer questions to the jury on special verdict forms.  The jury found beyond a reasonable doubt that Sanchez "possessed with intent to distribute" thirty kilograms or more of heroin during the duration of his participation in the conspiracy, and that he was a leader or organizer during that time.  With sentencing taking place in the aftermath of Booker, however, the court undertook an independent analysis of these issues.  The government argues that such a step was unnecessary in light of the special verdict, and that the jury's pronouncement should hold sway.  The trial court's thorough effort obviates the need to address this contention, and we will instead focus on the judge's findings.

[6]Under 18 U.S.C. § 841(b)(1)(A), these appellants each faced a statutory maximum sentence of life in prison.

-20-

individualized finding as to drug amounts attributable to, or foreseeable by, that defendant." Id. "Drug quantity is to be derived from all acts 'that were part of the same course of conduct or common scheme or plan as the offense of conviction.'" Santos, 357 F.3d at 140 (quoting U.S.S.G. § 1B1.3(a)(2)). "The essential inquiry is not what the defendant knew but what acts were reasonably foreseeable by him." Id. (citing Colon-Solis, 354 F.3d at 103). In the end, "each coconspirator is responsible not only for the drugs he actually handled but also for the full amount of drugs that he could reasonably have anticipated would be within the ambit of the conspiracy." Id. (citations omitted). Nor must the court's determination be exact: an approximation that "represents a reasoned estimate" suffices. Id. at 141.

As the government put on no witnesses at sentencing, the trial court relied on the trial testimony of the three cooperating witnesses and that of police officer Eddie Vidal-Gil, who had investigated drug trafficking at Los Lirios beginning in 1997. Officer Vidal-Gil testified that no less than two kilograms per month were sold at Los Lirios between 1999 and 2002, the time frame during which Sanchez was involved with the lower drug point.[7] Officer Vidal-Gil testified that he based his estimates on his own

---

[7]While there was some dispute as to the exact time frame of Sanchez's operation of the lower point, the judge was free to choose among credible alternatives. United States v. Cyr, 337 F.3d 96, 101 (1st Cir. 2003).

experiences, including interviews with suspects and informants and information shared by other officers. In addition to the officer's testimony, the court credited the trial testimony of Fernando Pagan Flores, who said that heroin sales produced $20,000 to $25,000 per day from a drug point which operated three shifts covering twenty four hours per day. Also, one of the several peddlers working under Sanchez had testified that he personally sold five kilograms of heroin between 1999 and 2001. These data points, when taken together, support the district court's conclusion as "a reasoned estimate" that Sanchez was responsible for thirty kilograms of heroin. Santos, 357 F.3d at 141. Thus, we find no error in his sentencing.

2. Mendez

Mendez, who was sentenced to life imprisonment, posits two claims of sentencing error. First, he argues that the trial judge erroneously concluded that Mendez was responsible for at least one kilogram of heroin. He further claims that his offense level should not have included an increase for the murder of Felix Gelbi. We disagree.

Mendez's sentencing proceedings were more protracted than Sanchez's. First, the Presentence Report (PSR) arrived at a base offense level of twenty four, based on a drug quantity of between 80 and 100 kilograms of marijuana, the only drug specifically noted

in the special verdict form addressed to Mendez.[8]  Addressing the death of Felix Gelbi, the PSR then applied the murder cross reference, which resulted in an offense level of forty-three, the highest level available.  See U.S.S.G. §§ 2D1.1(d)(1), 2A1.1. Although at the highest offense level, the PSR also "added" two levels for the firearms use and four for Mendez's leadership role. While an offense level of forty-three and a criminal history category of I would warrant life imprisonment, the PSR concluded that a statutory maximum of twenty years would apply based on the special verdict form's drug findings, which included only marijuana.  See 21 U.S.C. § 841(b)(1)(C).

Mendez objected to the PSR consideration of the murder, the managerial role, and the drug quantity (marijuana), and argued that he deserved a downward adjustment for acceptance of responsibility.  The government, for its part, argued that the court should find Mendez responsible for one kilogram of heroin, and requested that the judge impose a life sentence.

Following a five-day sentencing hearing during which both sides presented witnesses, the court concluded that it was reasonably foreseeable to Mendez that at least one kilogram of

---

[8]There was no explanation given as to why no heroin amount was asked on Mendez's special verdict form.  The trial judge did, however, recognize that he had the responsibility of making this determination. He also correctly noted that the verdict form asked the narrow question of what Mendez "possessed with intent to distribute," but not what was "foreseeable" to him, a factor which sentencing must take into account.  See Colon-Solis, 354 F.3d at 103.

-23-

heroin would be distributed, leading to an offense level of thirty-two. The court also applied the murder cross-reference and the managerial role adjustment, bringing the total offense level to forty three. Because of the judge's heroin finding, however, the sentence came within the ambit of 21 U.S.C. § 841 (b)(1)(A) -- with its maximum sentence of life. The court then sentenced Mendez to the maximum term. Mendez appeals the drug quantity calculation and the murder cross-reference.

As for the heroin calculation, we have little trouble finding that the evidence at trial and the sentencing hearing supports the trial court's finding. Pagan Flores testified that Mendez sold heroin at one of Gatillo's drug points in 1997 and 1998. Negron Torres noted that he was a friend of Mendez, and also a runner for Sanchez at the other drug point. From this, the court quite reasonably concluded that Mendez could foresee the sales at the other drug point. Pagan Flores also testified at the hearing that he saw Mendez selling drugs in twelve-hour shifts. Although part of this time was prior to the beginning of the charged conspiracy in 1997, the court noted that Mendez's direct participation spanned at least seven months into the existence of the charged conspiracy.

Against this factual backdrop, the court concluded that it could easily find that it was foreseeable to Mendez that more than one kilogram of heroin was sold. Given both his direct

participation in heroin sales, and the testimony about his knowledge of the activities of the other drug point, we find no error in this determination.

With respect to the murder cross-reference, Mendez simply rehashes the sufficiency argument he made to defeat the conspiracy charge, viz., that he didn't do it. He first notes that witness Negron Torres was discredited because of some discrepancies between his testimony and the forensic evidence. He then points to his own testimony that he was elsewhere at the time of the killing, and concludes, "there was evidence . . . which indicated that . . . Mendez committed the murder and there was evidence presented which indicated that he did not." Thus he argues, the evidence against him is "washed out" by his own testimony. It is not surprising that Mendez cites no authority for the proposition that evidence is automatically "washed out" by opposing evidence. There is none. Instead, it is axiomatic that the finder of fact -- whether the jury at trial or the judge at sentencing -- is free to choose from among competing versions of events. See United States v. Sepulveda, 15 F.3d 1161, 1201 (1st Cir. 1993) ("The district court's credibility determinations are beyond reproach."); see also Cyr, 337 F.3d at 101 (sentencing court's choice among plausible alternatives cannot be clearly erroneous). Accordingly we find no error in the murder cross-reference, and affirm Mendez's life

sentence.  We have reviewed Mendez's remaining sentencing arguments and find them without merit.

For the reasons set forth herein, appellants' convictions and sentences are **<u>Affirmed</u>**.