# United States Court of Appeals
## For the First Circuit

No. 11-2200

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN RÍOS-ORTIZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella, Circuit Judge,
and DiClerico,** District Judge.

Mark E. Howard, with whom Howard & Ruoff, PLLC, was on brief, for appellant.
Justin Reid Martin, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, were on brief, for appellee.

February 27, 2013

---

*Of the District of New Hampshire, sitting by designation.

**DICLERICO, District Judge**. Appellant Juan Ríos-Ortiz ("Ríos") was convicted after a jury trial of conspiracy to possess with intent to distribute controlled substances (Count One), distribution of a controlled substance (Count Six), and possessing and providing contraband to a prison (Count Seven). He was sentenced to a term of imprisonment of seventy-eight months.

Ríos appeals his conviction on Count One, arguing that the evidence was insufficient to support a conviction as to the charged conspiracy. Specifically, Ríos argues that the evidence was insufficient to establish a single conspiracy beginning on or about December 2009 and continuing until on or about February 2, 2010.

For the reasons that follow, we affirm the judgment of the district court.

I.

The facts are recited in the light most favorable to the verdict being appealed. United States v. Poulin, 631 F.3d 17, 18 (1st Cir. 2011). As of December 2009, Ríos was employed as a forklift operator at Carribean Produce ("CP"), a company that distributes fruits, vegetables, and eggs to, among other customers, the Metropolitan Detention Center Guaynabo ("MDC") in San Juan, Puerto Rico. Typically, a customer would place an order with someone in CP's client service department. The employee who took the customer's order would create a "picking list," which is given

-2-

to a dispatcher. The dispatcher would select the boxes of products ordered by a customer from various coolers within CP's warehouse, put the boxes on pallets, and wrap the boxes with tape. Another employee would then compare the products on the pallets with the picking list and, if the selected items matched the picking list, a forklift operator would load the pallets onto a delivery truck for shipment to the customer. Ríos, like other CP forklift operators, sometimes acted as a dispatcher for an order.

MDC orders were picked up from CP by Jesús Piñero, an independent driver who made deliveries from CP to MDC on a weekly basis. All food deliveries to MDC were received at the facility's warehouse by the foods service warehouse supervisor. The supervisor inspected the delivery to ensure that none of the food items were damaged or spoiled. An inmate forklift operator would then unload and transfer the delivery to the rear gate of the facility. There, an officer would x-ray a part of the shipment, as determined on a shipment-by-shipment basis at the officer's discretion, to screen for contraband or damage. Once the goods passed through the screening process, they would be brought to the food service area to be unloaded and stocked inside the facility's walk-in coolers.

On December 29, 2009, CP prepared an order for MDC ("December 29th order"). Piñero delivered the order to MDC and 10% of the shipment was x-rayed. No contraband or damage was found at

that time. The order was then unloaded and stocked in MDC's coolers.

The following day, Norman Vélez, a cook supervisor at MDC whose duties included receiving and storing food items, was working in the food service department. As Vélez approached cooler number five, which held vegetables, he saw the inmate who had been cleaning the cooler attempt to close the door quickly. Vélez thought that the inmate's movement was suspicious and held the cooler door open. Vélez looked inside and saw another inmate, who was not authorized to be in that area, searching one of the boxes of produce. Vélez removed the inmate from the cooler, locked it, and called for backup.

Vélez and José Rosa, a special investigator supervisor at MDC, searched the cooler. While inspecting CP's delivery from the previous day, Vélez and Rosa found several bags of contraband, wrapped in electrical tape, inside a box of celery. The bags contained eight cell phones, SIM cards, cell phone charger connectors, cigarettes, alcohol, Xanax pills (containing the controlled substance alprazolam), Percocet pills (containing the controlled substance oxycodone), cocaine, heroin, and marijuana. In addition, one of the bags contained a piece of paper with what Rosa described at trial as a "possible nickname" on it.

Carlos Falcón, the distribution manager at CP, was notified about the contraband that had been found in the celery

-4-

box. Falcón checked CP's surveillance system, which consisted of twenty-seven cameras in the warehouse and a hard disk that records for sixteen days before it is automatically overwritten. Falcón testified that he reviewed the video that showed the preparation of the December 29th order. According to Falcón, Ríos acted as the dispatcher for that order. Falcón testified that Ríos performed his dispatch duties normally, except that he reinforced one celery box heavily with tape.[1]

After MDC discovered the contraband in the December 29th order, CP began sealing the door on Piñero's truck after loading for all future deliveries to ensure that he would not be a suspect if contraband were found again. In addition, CP also began requiring all dispatchers to fill out a document called a "tablilla," which contained the details of the order.[2]

On February 2, 2010, Piñero delivered another order from CP to MDC ("February 2nd order"). At MDC, the seal on Piñero's truck was broken, and the delivery was unloaded. While being unloaded, a box containing eggs began to break open from the bottom. The box was immediately placed on the x-ray machine, which showed that the box contained contraband. FBI Agent Dave Becerra,

---

[1] The jury was not able to view the video showing Ríos's preparation of the December 29th order because it had been automatically overwritten under the normal procedure.

[2] CP's regular policy was to require tablillas to be filled out for every delivery, but it was not strictly enforced prior to the incident with the December 29th order.

who was at MDC conducting interviews regarding the December 29th order, took the box to his office.

The box of eggs contained several bags of contraband wrapped in electrical tape as were the bags of contraband found in the December 29th order. The contraband included nine cell phones, a large quantity of cigarettes, and over one thousand pills containing either alprazolam or oxycodone. Becerra removed the tape from the bags of contraband and sent it to the FBI lab in Quantico, Virginia for fingerprint analysis. The FBI found two latent fingerprints, one of which belonged to Ríos. Ríos's fingerprint was found on the adhesive side of the tape.

Upon learning of the contraband in the February 2nd order, Falcón again consulted CP's surveillance system. As Falcón testified at trial, the video showed Ríos working as a dispatcher and performing his duties abnormally for that order.[3] For example, Ríos stacked the egg boxes too high, removed a tray of eggs from one of the boxes and took it to the corner of the room, and took longer than normal to prepare the order, none of which is standard procedure for a dispatcher. Unlike the video of the December 29th order, the video of the February 2nd order had not been overwritten, and it was shown to the jury at trial.

---

[3] Ríos was also listed as the dispatcher on the tablilla for the February 2nd order.

-6-

At the close of the government's case, Ríos moved for a judgment of acquittal as to all counts under Fed. R. Crim. P. 29.[4] The court reserved its ruling on the motion, and Ríos rested without testifying or presenting any witnesses.

The jury convicted Ríos of Count One (conspiracy), Count Six (distribution of a controlled substance - oxycodone), and Count Seven (providing contraband to a prison). Counts Six and Seven related to the February 2nd order. The jury acquitted Ríos of Counts Two, Three, Four, and Five, all of which related to the December 29th order.

## II.

On appeal, Ríos raises several challenges to his conspiracy conviction. He contends that the district court erred in denying his Rule 29 motion as to his conspiracy conviction because there was no evidence of a conspiratorial agreement; that his conviction for conspiracy and his acquittal on certain underlying substantive offenses constitute impermissible inconsistent verdicts; and that although the government charged one overarching conspiracy, at best it proved multiple conspiracies, representing a prejudicial variance. All of Ríos's challenges are based on the contention that the evidence was insufficient to

---

[4] Rule 29 provides that: "After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

support a conviction on Count One for a conspiracy beginning on or about December 2009 and continuing to on or about February 2, 2010.

We review Ríos's sufficiency of the evidence claim <u>de novo</u>, considering the evidence in the light most favorable to the verdict. <u>United States</u> v. <u>Green</u>, 698 F.3d 48, 56 (1st Cir. 2012). "A reversal is warranted only where no rational factfinder could have concluded that the evidence presented at trial, together with all reasonable inferences, established each element of the crime beyond a reasonable doubt." <u>United States</u> v. <u>Symonevich</u>, 688 F.3d 12, 23 (1st Cir. 2012).

A.          <u>Existence of a Conspiratorial Agreement</u>

Ríos argues that the trial court erred in denying his Rule 29 motion because the evidence adduced at trial was insufficient to support the existence of an agreement to possess and distribute controlled substances. Specifically, he points to the lack of evidence concerning any interactions or communications between Ríos and another co-conspirator prior to either the December 29th order or the February 2nd order.[5] He argues that there was no evidence of knowledge and coordination of efforts and

---

[5] Ríos also contends, in passing, that he only acted as a dispatcher for the orders because he was told to do so by a supervisor, which he argues goes against the government's theory that he was part of a conspiracy. To the extent that Ríos intends to make that argument, the fact that he may have been told to act as a dispatcher for the orders does not undermine the existence of a conspiracy.

therefore, a jury could not have found beyond a reasonable doubt that he participated in a conspiracy.

"'To prove conspiracy in a [narcotics] case, the government must prove beyond a reasonable doubt that an agreement existed to commit the underlying substantive offense, and that the defendant elected to join the agreement, intending that the underlying offense be committed.'" United States v. Landrón-Class, 696 F.3d 62, 69 (1st Cir. 2012) (quoting United States v. Medina-Martínez, 396 F.3d 1, 5 (1st Cir. 2005)). "'The essence of the crime is the conspirators' agreement to act in concert' to import, possess, and distribute illegal drugs." United States v. Paret-Ruiz, 567 F.3d 1, 5-6 (1st Cir. 2009) (quoting United States v. Cruz, 568 F.2d 781, 782 (1st Cir. 1978)); see also United States v. Rodríguez, 525 F.3d 85, 104 (1st Cir. 2008).

"An agreement between coconspirators may be proven by circumstantial evidence, and it may be tacit." United States v. Rivera-Donate, 682 F.3d 120, 134 (1st Cir. 2012) (quoting Paret-Ruiz, 567 F.3d at 6) (internal quotation marks omitted); see also United States v. Gómez-Rosario, 418 F.3d 90, 107 (1st Cir. 2005); United States v. Concemi, 957 F.2d 942, 950 (1st Cir. 1992) ("an agreement . . . may be inferred from a development and collocation of circumstances") (quoting United States v. Smith, 680 F.2d 255, 259 (1st Cir. 1982)) (internal quotation marks omitted). A conspiratorial agreement, therefore, "need not be express so long

as its existence can plausibly be inferred from the defendants'
words and actions . . . ." United States v. Famania-Roche, 537
F.3d 71, 78 (1st Cir. 2008) (quoting United States v. Boylan, 898
F.2d 230, 241-42 (1st Cir. 1990)) (internal quotation marks
omitted); see also United States v. Pérez-Ruiz, 353 F.3d 1, 7 (1st
Cir. 2003) (a defendant cannot succeed with a sufficiency challenge
"as long as a plausible reading of the record supports the jury's
implied finding that [the defendant] knowingly participated in the
charged conspiracy").

In this case, the government presented circumstantial
evidence to demonstrate the existence of an agreement to distribute
controlled substances. Ríos prepared and loaded onto the delivery
truck both orders for MDC. According to testimony, for the
December 29th order, CP's security cameras showed Ríos heavily
taping the celery box that held the bags containing the contraband.
At MDC, Vélez found an unauthorized inmate searching through the
box of celery containing the bags of contraband, which were wrapped
in electrical tape, and one of the bags contained a card with a
possible nickname on it. For the February 2nd order, the video
taken by CP's security camera and presented to the jury showed Ríos
preparing the orders in a manner that was contrary to proper
procedure, and removing a tray of eggs from a box and taking the
tray to the corner of the warehouse. At MDC, one of the egg boxes
was found to contain bags of contraband wrapped in electrical tape

as were the bags of contraband found in the December 29th order. The tape that wrapped one of the bags had several fingerprints on the adhesive side, one of which belonged to Ríos. In addition, the egg box containing the bags of contraband had a red mark on it.

When viewed in the light most favorable to the verdict, this evidence is sufficient to permit a jury to reasonably conclude that Ríos was a participant in a conspiracy to distribute controlled substances. Ríos prepared the orders, both of which contained some sort of marker which could have been an act of communication with a co-conspirator within MDC.[6] In addition, the jury could have concluded that the several sets of fingerprints on the tape used to wrap a bag of contraband in the February 2nd order were those of a co-conspirator outside of MDC. Although Ríos points to the lack of communications with co-conspirators, "[a]

---

[6] In the case of the December 29th order, the marker was the extra tape on the celery box. In the case of the February 2nd order, the marker was the red mark on the egg box. Ríos suggests that the extra tape on the celery box in the December 29th order could not have been a marker because the contraband was not discovered until the following day. Ríos argues that the "lapse of time, during which contraband was sitting in a cooler at MDC, available to be discovered by anyone who had access to that area of the facility, defies a conclusion that the tape on the box was an attempt to communicate." That argument is belied by the testimony of Victor Roberto Vega, MDC's food service supervisor, who testified that produce is often delivered and stored a week before it is used. Regardless, when the evidence is viewed in the light most favorable to the verdict, the jury could have concluded that the extra tape on the celery box was intended to be used as a marker to communicate with a co-conspirator, particularly when considered along with the card found inside one of the bags of contraband with a possible nickname on it.

-11-

defendant can be indicted and convicted even if the names of his co-conspirators are unknown, as long as the government presents evidence of an agreement between two or more persons." United States v. Nason, 9 F.3d 155, 159 (1st Cir. 1993). "The essence of a conspiracy is the existence of the conspiracy agreement, not the identity of those who agree." Id. Therefore, sufficient evidence existed to support the existence of a conspiracy.

B.        Inconsistent Verdicts

Ríos also argues that the jury's verdicts are inconsistent and that his conviction must be overturned. He contends that acquittal on the substantive charges relating to the December 29th order is inconsistent with his conviction on the conspiracy charge, which alleges those substantive crimes as objects of the conspiracy.

"Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment." Dunn v. United States, 284 U.S. 390, 393 (1932). Inconsistent verdicts "may be the result of [jurors'] lenity, coupled with the Government's inability to invoke review." United States v. Powell, 469 U.S. 57, 66 (1984). Therefore, "the best course to take is simply to insulate jury verdicts from review on this ground." Id. at 69; see also United States v. Cianci, 378 F.3d 71, 92 (1st Cir. 2004); United States v. Alicea, 205 F.3d 480, 484 (1st Cir. 2000)

(a "jury verdict [which] is internally inconsistent . . . is essentially unreviewable").

With regard to charges of conspiracy, "[t]he substantive crime and the conspiracy to commit it are separate offenses." United States v. López, 944 F.2d 33, 41 (1st Cir. 1991). "Although it may seem inconsistent . . . to convict on the conspiracy charge, and acquit the same defendant on the substantive charge alleged to have been the object of the conspiracy, the Supreme Court has made it clear that verdict inconsistency in itself is not a sufficient basis for vacating a conviction." Id. Therefore, so long as there is "sufficient evidence to sustain a rational verdict of guilt beyond a reasonable doubt" for a conspiracy charge, "an inconsistent verdict should stand." United States v. Figueroa-Encarnación, 343 F.3d 23, 30 n.4 (1st Cir. 2003) (quoting López, 944 F.2d at 41) (internal quotation marks omitted); see also Powell, 469 U.S. at 66; United States v. Cornelius, 696 F.3d 1307, 1317 (10th Cir. 2012) ("'[T]he fact that contrary verdicts are returned as between a conspiracy count and a count charging a substantive offense presents no such inconsistency as requires reversal.'") (quoting W.E. Shipley, Annotation, Inconsistency of Criminal Verdicts as Between Different Counts of Indictment or Information, 18 A.L.R. 3d 259 § 30[a] (1968)).

Ríos does not contend that inconsistent verdicts are impermissible generally or in all conspiracy cases. Rather, he

argues that a defendant may be convicted of a conspiracy charge and acquitted of the substantive charges which form the objects of the conspiracy only when there is sufficient evidence to support a conspiracy conviction.  In other words, Ríos's argument concerning inconsistent verdicts repeats his insufficiency of the evidence claim.  As discussed, the evidence was sufficient to support the existence of a conspiracy.  Therefore, the asserted inconsistency in the verdict is not grounds for reversal.

C.      Variance

Ríos further argues that to the extent there was sufficient evidence of conspiracy, the evidence demonstrated two separate conspiracies rather than one overarching conspiracy, as was charged in the indictment.  Therefore, he contends that a variance occurred which affected his substantial rights, and his conviction must be reversed.

"A variance occurs when the crime charged remains unaltered, but the evidence adduced at trial proves different facts than those alleged in the indictment."  United States v. Yelaun, 541 F.3d 415, 419 (1st Cir. 2008).  "[T]o be grounds for reversal, a variance must be severe enough to affect the defendant's substantial rights."  United States v. Mubayyid, 658 F.3d 35, 54 (1st Cir. 2011).  "When, as here, a defendant asserts a claim of variance that is premised on the notion that multiple conspiracies existed and that his activities were not part of the charged

-14-

conspiracy, the initial question . . . is one of evidentiary sufficiency." Rivera-Donate, 682 F.3d at 128 (quoting Pérez-Ruiz, 353 F.3d at 7) (internal quotation marks omitted).

In order to find that a single conspiracy charge existed, it must have been possible for the jury to "infer from the acts and statements of the witnesses a single ongoing 'agreement' that embraced [Ríos] and other co-conspirators." United States v. Jones, 674 F.3d 88, 92 (1st Cir. 2012). In determining whether the evidence supports the existence of a single conspiracy, we ultimately look at the totality of the circumstances. See United States v. Sánchez-Badillo, 540 F.3d 24, 29 (1st Cir. 2008). "While the nature of the illegal activity, the method of operation, and the scope of conspirator involvement are factors to be considered in determining whether a single conspiracy has been proved, if the totality of the evidence is adequate to demonstrate that all of the alleged coconspirators directed their efforts towards the accomplishment of a common goal or overall plan, then the existence of a single conspiracy can be found." United States v. Drougas, 748 F.2d 8, 17 (1st Cir. 1984); see also Sánchez-Badillo, 540 F.3d at 29 (factors to consider include "(1) the existence of a common goal, (2) interdependence among the participants, and (3) overlap among the participants"); United States v. LiCausi, 167 F.3d 36, 45 (1st Cir. 1999) (factors to consider include "the commonality vel non of the nature, motive, design, implementation, and logistics of

-15-

the illegal activities"). Although conflicting inferences may arise, so long as the evidence is adequate to permit a reasonable trier of fact to have found a single conspiracy beyond a reasonable doubt, the jury's finding will not be disturbed on appeal. See Boylan, 898 F.2d at 243.

In this case, a reasonable trier of fact could have found the existence of a single conspiracy beyond a reasonable doubt. Both the December 29th order and the February 2nd order had a common goal: smuggling illegal contraband into MDC. Ríos prepared both orders and wrapped the contraband in both orders in a similar fashion with electrical tape, and a partial fingerprint belonging to Ríos was found on the sticky part of one of the wrappings. Therefore, a common goal and design, as well as Ríos's involvement, could be discerned between the two incidents. See Sánchez-Badillo, 540 F.3d at 29 (discussing the "wide breath" of the common goal requirement). Although Ríos points to the lack of evidence regarding the similarity of the CP workers or MDC kitchen inmates who were present during the two deliveries, that lack of proof does not undermine a finding that a single conspiracy existed. See United States v. Cruz-Rodríguez, 541 F.3d 19, 28 (1st Cir. 2008) (a conspiracy may be proven without establishing that "(1) each conspirator knew of or had contact with all other members; (2) each conspirator knew of all the details of the conspiracy or participated in every act in furtherance of it; or (3) the

-16-

conspiratorial 'cast of characters' remained intact throughout the duration of the entire enterprise"); see also United States v. Franco-Santiago, 681 F.3d 1, 9 (1st Cir. 2012) (government does not have to prove that the defendant had "knowledge of every other participant, or of the details of the conspiracy, but knowledge of the broader conspiracy's existence is critical") (internal quotation marks and citations omitted).

Accordingly, when viewed in the light most favorable to the prosecution, the evidence would allow a rational jury to determine beyond a reasonable doubt that the single conspiracy charged in the indictment existed and, therefore, a variance did not exist. See United States v. Maryea, ___ F.3d ___, 2013, WL 150316, at *20 n.4 (1st. Cir. Jan. 15, 2013) ("Since we do not find that the evidence established an agreement different from that charged, we need not address the issue of variance."). Therefore, "[w]e . . . need not reach the issue of whether [Ríos] was prejudiced by any variance in our analysis." Id.

### III.

For the foregoing reasons, the judgment of the district court is affirmed.

**Affirmed**.