# United States Court of Appeals
## For the First Circuit

No. 11-2271

UNITED STATES OF AMERICA,

Appellee,

v.

HIPÓLITO DÍAZ-ARIAS, a/k/a HIPÓLITO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, U.S. District Judge]

Before

Torruella, Boudin,* and Thompson,
Circuit Judges.

John F. Cicilline, for appellant.
Theodore B. Heinrich, Assistant United States Attorney, with
whom Carmen M. Ortiz, United States Attorney, was on brief for
appellee.

April 29, 2013

_____

* Judge Boudin heard oral argument in this matter and participated
in the semble, but he did not participate in the issuance of the
panel's opinion in this case. The remaining two panelists therefore
issued the opinion pursuant to 28 U.S.C. § 46(d).

**TORRUELLA, Circuit Judge.** Following a four-day jury trial, Defendant-Appellant Hipólito Díaz-Arias was found guilty of conspiring to distribute cocaine, in violation of sections 841(a)(1) and 846 of Title 21 of the United States Code. He received a sentence of 120 months' imprisonment to be followed by a supervised release term of five years. Díaz-Arias now appeals his conviction and sentence, claiming that the district court erred in (1) permitting a non-expert witness to identify him as one of the speakers in several wiretap recordings, which the government introduced at trial to establish his involvement in the conspiracy; (2) allowing the jury to receive the transcripts of those recordings, which were labeled with his first name, "Hipólito," in order to identify him as one of the speakers; (3) allowing the government to introduce evidence about his co-defendants' unrelated drug activity; (4) declining to give the jury a specific instruction regarding any animosity they may have towards his race and ethnicity; (5) refusing to allow the jury to make a determination as to the specific drug quantity that could be attributed to him in the conspiracy; and (6) finding, by a preponderance of the evidence, that he was involved with five or more kilograms of cocaine. Finding no error in the district court's actions, we affirm its judgment in all respects.

# I.  Background

## A.  The Indictment and Investigation

On July 27, 2005, Díaz-Arias and twelve other co-defendants were charged pursuant to a four-count, first superseding indictment issued by a grand jury in the District of Massachusetts. Díaz-Arias was only charged in Count One of the indictment, which alleged that he participated in a conspiracy to distribute at least five kilograms of cocaine, from January to October 2004, at various locales within the District of Massachusetts.  Among the other defendants who were charged in Count One were Manuel Pinales, Rafael Heredia,[1] Richard Pena and Tajh M. White.  The following facts are recounted in the light most favorable to the verdict. United States v. Poulin, 631 F.3d 17, 18 (1st Cir. 2011).

The charges brought against Díaz-Arias arose out of an investigation conducted by the Drug Enforcement Administration ("DEA") during the summer and fall of 2004.  The focus of the investigation was an organization involved in the distribution of large quantities of cocaine in the Boston area.  Manuel Pinales was identified as the leader of the organization, receiving cocaine in quantities of between 30 and 80 kilograms at a time from a source of supply in the Dominican Republic.  Pinales and his cohorts then

---

[1]  Heredia was also known as Luis Clas or "Cuba."  During Díaz-Arias' trial, the government referred to him as Luis Clas.  On appeal, both parties refer to him in their briefs as Heredia.  We do the same here.

distributed these drugs to customers in the Boston, New Bedford and Lowell areas of Massachusetts, as well as to customers in Rhode Island. According to the results of the investigation, the core members of the Pinales organization were Heredia, Rodríguez and Pena.

The DEA investigation relied on court-authorized wiretaps on phones belonging to Pinales, Rodríguez, Pena and Heredia. The evidence submitted at trial against Díaz-Arias consisted primarily of recordings of conversations between Pinales, Pena, Heredia and a man referred to as "Hipólito," whom the government later identified as Díaz-Arias. The government also relied on several "drug ledgers" that were seized on October 8, 2004, pursuant to search warrants executed on 115 Navarre Street, where Heredia maintained an inventory of cocaine, and at another location known as the "Park Avenue Market," a grocery store run by Pinales. The government's position at trial was that the ledgers linked Díaz-Arias (referred to in the ledgers as "Hipólito" or "H.P.") with several kilograms of cocaine and thousands of dollars paid or owed to the Pinales organization. The wiretap recordings, which the government also used to prove that Díaz-Arias was a regular customer of the Pinales organization, are discussed in more detail below.

### B. The Wiretapped Conversations

In July 2004, law enforcement agents began intercepting several telephone calls between Hipólito, Pinales, Pena and Heredia. These telephone calls depicted Hipólito attempting to broker several drug transactions with Pinales, with Hipólito asking Pinales to "give me some stuff" and later reminding Pinales "I owe you seven and a half." The intercepted conversations also revealed that the parties spoke in code, referring to kilograms of cocaine as "cars" and money as "tickets."

The low point for Hipólito came in the final days of September, when one of his planned cocaine transactions with Pinales went awry. It all began on September 28, when agents intercepted a telephone call where Hipólito told Pinales the following: "so, tomorrow, I am going to send the guy over there . . . to bring the tickets, the little tickets, yes, and so you give him that." Pinales responded, "[a]lright . . . [t]ell him to call me, so that he meets up with Viejo . . ."[2]

The next day, at 11:47 a.m., Alex Hernández, Hipólito's courier, called Pinales and said: "I am Hipólito's guy. I will, I am going to call you . . . in a couple of minutes, do you hear?" Pinales told Hernández that this was fine, but gave him another

---

[2] Trooper Cepero testified that, over the course of the investigation, he concluded that "Viejo," which in this context translates into English as "Old Man," was a reference to either Heredia or Pena. In this particular call, the government posited that Pinales was referring to Heredia.

phone number and asked him to "[c]all him there." An hour later, Hernández placed a call to the phone number that Pinales gave him, which turned out to belong to Heredia. Hernández again identified himself as "Hipólito's guy," and Heredia instructed him to "come by here, by near here, by Hyde Park," where the "little store"[3] was located. Hernández told Heredia that he would stop by there to "pick up a pair of pants." Heredia then called Pinales to ask what he should give to Hernández, to which Pinales responded "the usual" or "the complete one." Massachusetts State Trooper Jaime Cepero, who was eavesdropping on these calls while sitting in a wire room, alerted surveillance officers that there was a person heading to the Park Avenue Market to meet with Heredia, and that said person was going to be receiving a kilogram of cocaine.

At 1:00 p.m., several law enforcement officers, including DEA Task Force Agent Kevin McDonough, were conducting surveillance around the Park Avenue Market. Twenty minutes later, McDonough observed Heredia come out of the Park Avenue Market, wearing an unzipped jacket. As Heredia stood outside, a red Mustang pulled over next to him, and he began to talk with the driver. At that point, Heredia entered the vehicle through the passenger door, and the vehicle then proceeded down Hyde Park Avenue. It stopped just a few blocks away from 115 Navarre Street. Heredia emerged from the vehicle and entered a residence at that location. One or two

---

[3] This is apparently a reference to the Park Avenue Market.

minutes later, Heredia exited the residence, this time with his jacket zipped up and his hands inside his pockets. Agent McDonough perceived him to be holding something around his stomach area. Heredia then traveled to the Mustang, reconvened with the driver, and together they headed back to the area of the Park Avenue Market. Now back there, Heredia stepped out of the vehicle, and the vehicle continued on its way. The officers, including Agent McDonough, proceeded to follow it in their unmarked cars.

The red Mustang made its way through several streets in Boston, eventually embarking on Interstate 93, northbound. As Agent McDonough was shadowing the vehicle, Trooper Cepero, who was still in the wire room, contacted a nearby Massachusetts State Police barracks to arrange for a marked police cruiser to stop the Mustang. Trooper John Costa and Sergeant McCarthy, who were in the area driving separate police cruisers, spotted the Mustang as it was approaching the town of Wilmington, Massachusetts and ordered it to pull over onto the hard shoulder lane.[4] They identified the driver as Alex Hernández and conducted a search of the vehicle using trained canines. The canines sniffed around the vehicle and alerted the officers to an area under the rear of the passenger seat; the officers inspected the floor around this area and found a possible hidden compartment. Hernández was placed under arrest,

---

[4]   Trooper Costa testified that, at the time, the Mustang was traveling over the speed limit and was following the vehicle in front of it too closely.

and the Mustang was towed to the Andover barracks, where an inspection of the hidden compartment yielded a kilogram of cocaine.

As time passed, Hipólito grew anxious awaiting Hernández's arrival. At 3:31 p.m., he called Pinales and asked "[a]t what time did you guys give the car to the guy?" Pinales replied, "[a] while ago . . . [i]s he not answering the phone?" "No, he is not answering now . . . [y]ou know how that is," said Hipólito. A worried Pinales then told Hipólito "[o]h, damn . . . [b]ad sign . . . [t]here are problems there, bro . . . I hope . . . God willing there are not . . ." The two agreed that they would wait and see what happened to Hernández, with Hipólito promising to call Pinales as soon as he had news.

At 4:57 p.m., Hipólito finally called Pinales and told him: "[t]hey caught the man, dude." Dismayed, Pinales asked where, and Hipólito replied, "in Andover." Hipólito then told Pinales that he was going to call someone to figure out what was going on. Pinales and Hipólito spoke again on the phone at 7:39 p.m. Pinales warned Hipólito that "[i]t seems the friend is singing" to the police, and Hipólito advised Pinales to change his phone numbers. Almost two hours later, Hipólito called Pinales and told him that he had spoken with Hernández's lawyer, who confirmed that the police had "caught him with that, yes." Several other phone conversations between Hipólito and Pinales were intercepted on the

following day.  Those recordings mostly featured discussions concerning the amount of Hernández's bail.

### C.  Jacqueline Fresa

During trial, Trooper Costa testified that on October 2, 2004, he received a phone call from a woman who identified herself as Jacqueline Fresa.  He testified that Fresa expressed anger at the arrest of Hernández, and that she complained about receiving threats, because "somebody had said that she was the informant that had told the police about Hernández" and therefore was responsible for his arrest.  Fresa denied being the informant, but admitted she knew Hernández.

On the same day, Hipólito told Pinales over the phone that, "[t]he mother of my daughters . . . I got told that . . . she screwed me over."  "But which one of them, who?" asked Pinales. "The one who was in jail, who came out," replied Hipólito. Hipólito told Pinales that, shortly before Hernández was arrested, "the mother of [his] daughters" had called Hernández to find out where he was.  Hipólito then claimed that, as soon as Hernández told her his location, "like five hundred showed up . . . she is a rat[,] man . . ."  A few days later, on October 7, Hipólito called Pinales again and told him that the mother of his daughters had filed a restraining order against him.

During the trial, the district court admitted into evidence certified birth records from the city of Haverhill,

Massachusetts, which showed that Díaz-Arias and Fresa were in fact the parents of two daughters. In addition, the district court admitted a certified record from the Haverhill District Court, which reflected that on October 4, 2004, Fresa had filed a restraining order against Díaz-Arias. Thus, the government claims that Fresa was the one Hipólito referred to as "the mother of [his] daughters," and that this was conclusive evidence proving that Hipólito was in fact Díaz-Arias.[5]

### D. Arrest and Sentencing

Díaz-Arias was arrested on October 22, 2004, in Lowell, Massachusetts, while using the name of Carlos Santiago. He was also known to use other aliases, such as "Junio Humberto Santana Ortiz," "Raphael Ortiz Santino," "Guillermo Sánchez" and "José Nieves." Díaz-Arias was subsequently released on bail, but became a fugitive when he was indicted on the federal drug charge. On June 11, 2009, he was arrested in Lynn, Massachusetts. At that time, the officers found Díaz-Arias to be in possession of a Dominican passport in the name of Rafael Bienvenido Reynoso

---

[5] Fresa also testified at trial and identified Díaz-Arias as the father of two of her three daughters. She stated that she knew Hernández, that she was supposed to go out with him on the day he was arrested, and that after learning of his arrest, she called the Andover police station to complain about people commenting that she was the informant who helped them apprehend Hernández. Fresa further testified that, later on, she asked Hipólito to "beat up" Hernández in retribution for Hernández accusing her of being the snitch. When Hipólito refused, Fresa took out a restraining order against him.

Hernández and a Social Security Card in the name of Rafael Matos Bruno.

The jury found Díaz-Arias guilty of participating in the charged conspiracy. At sentencing, the district court found, by a preponderance of the evidence, that he was responsible for at least five kilograms of cocaine and therefore subject to a mandatory minimum sentence of ten years. 21 U.S.C. § 841(b)(1)(a)(ii) (2006). The court determined that the applicable guideline range for Díaz-Arias, taking into account an offense level of 32 and a criminal history category of III, was 151 to 188 months. The court nevertheless varied downward to reflect the culpability of Díaz-Arias in comparison to the other defendants in the case and sentenced Díaz-Arias to 120 months' imprisonment to be followed by five years of supervised release. This timely appeal followed.

## II. Discussion

### A. The Voice Identification Testimony

Díaz-Arias' main argument in this appeal is that the district court abused its discretion when it allowed the government to introduce the lay opinion testimony of Trooper Cepero, who identified Díaz-Arias as the speaker in the intercepted telephone conversations. He contends that this testimony ran afoul of Federal Rule of Evidence 701 for lay opinion testimony because it: (1) was not helpful to the jury; (2) was not based on personal knowledge; (3) constituted expert testimony masked as lay opinion;

-11-

and (4) was factually flawed.  The following background on Trooper Cepero's testimony at trial will assist us in sorting through these arguments.

### 1.  Background

Trooper Cepero is a trooper with the Massachusetts State Police, where he has served for approximately 30 years, primarily in narcotics enforcement.  At trial, he testified that he has fulfilled many roles there, including working undercover, serving search warrants, doing surveillance and serving as affiant on wiretaps.  He stated that he has participated in hundreds of investigations, including over 30 that involved wiretaps.  He was born in Puerto Rico, and Spanish is his native language; he continues to speak Spanish fluently and uses it in connection with his duties as a state trooper.  For example, he has used his Spanish skills in several wiretap investigations involving Spanish speakers.  He testified that he is familiar with individuals from the Dominican Republic (where Díaz-Arias is from) and their speaking intonations and accents.

Trooper Cepero testified that he was a co-case agent on the DEA investigation that led to Pinales' and Díaz-Arias' arrests. During most of the investigation, Cepero was stationed in a "wire room," overseeing and reviewing the audio of the intercepted telephone calls from the day before, as well as the transcripts and summaries of those calls.  Whenever a phone call was made to or

from an intercepted phone line, the call would be recorded via computer onto an optical disk that would contain the audio of the call, the data furnished by the phone company, and any additional comments provided by the officer monitoring the call. In preparation for trial, Trooper Cepero copied the recorded calls that involved Hipólito onto a separate optical disk and reviewed the transcripts and translations of those recorded conversations. The parties do not seem to dispute that the transcripts accurately reflected the words spoken among the speakers, which were translated from Spanish into English.

During trial, the government introduced into evidence Exhibits 26 and 27, which featured the recorded telephone calls that involved "Hipólito" and the transcripts of those calls. Trooper Cepero testified that he had reviewed all of those calls with their companion transcripts, and assured that the transcripts accurately identified the speakers and the words spoken. He testified that he spent approximately "five or six hours" listening to the calls in preparation for trial.

In order to adequately compare the voice of "Hipólito" in Exhibits 26 and 27 with the voice of Díaz-Arias, the prosecution introduced Exhibit 41, a compact disk that contained at least 16 recorded telephone calls, which the parties stipulated were "recent recordings of the defendant Hipólito Díaz-Arias' voice obtained by lawful means." Some of the recordings included conversations

between Díaz-Arias and Fresa.  Trooper Cepero testified that he spent about three hours listening to the calls in Exhibit 41 in their entirety and went over some of them a couple of times.  In preparation for trial, he compared the voice of Díaz-Arias on Exhibit 41 with the voice of Hipólito on Exhibit 27.  In making that comparison, Trooper Cepero testified that he took into account several factors, including: (1) things that were unique to the voice, such as greetings, laughter, tone, manner and speech pattern; (2) certain expressions that could not have been rehearsed; (3) certain expressions that were indicative of something the speaker did all the time; and (4) if the speaker used, or responded to, his name, and whether the speaker referenced to having spoken with someone else beforehand.  Based on these factors, Cepero testified that, in his opinion, the voices belonged to "the same gentleman, same voice."  Díaz-Arias lodged an objection to this testimony, but it was overruled by the district court.  He now renews his objection to the admission of the lay opinion testimony before us, which we review for manifest abuse of discretion.  United States v. Valdivia, 680 F.3d 33, 50 (1st Cir. 2012).

## 2.  Helpfulness to the Jury

Díaz-Arias claims that the proffered testimony by Trooper Cepero was not helpful to the jury because the jurors were just as capable as Trooper Cepero of comparing the voice of Hipólito with

-14-

that of Díaz-Arias. We disagree. In order for lay opinion testimony to be admissible under Federal Rule of Evidence 701, the testimony must be "helpful to clearly understanding the witness' testimony or to determining a fact in issue." Fed. R. Evid. 701(b); United States v. Flores-de Jesús, 569 F.3d 8, 20 (1st Cir. 2009).

Lay opinion testimony will not be "helpful" to the jury "when the jury can readily draw the necessary inferences and conclusions without the aid of the opinion." United States v. Sanabria, 645 F.3d 505, 515 (1st Cir. 2011) (quoting Lynch v. City of Boston, 180 F.3d 1, 17 (1st Cir. 1999))(emphasis added). The "nub" of this "helpfulness" requirement is "to exclude testimony where the witness is no better suited than the jury to make the judgment at issue, providing assurance against the admission of opinions which would merely tell the jury what result to reach." United States v. Meises, 645 F.3d 5, 16 (1st Cir. 2011) (internal quotations and citations omitted); see also United States v. Vázquez-Rivera, 665 F.3d 351, 361 (1st Cir. 2011) ("[T]estimony, the 'sole function' of which is 'to answer the same question that the trier of fact is to consider in its deliberations . . . [m]ay be excluded as unhelpful.'") (quoting 4 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 701.05 (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2011)). We are mindful that lay opinions which make an assertion as to the ultimate issue in a case "will

rarely meet the requirement of Rule 701(b), since the jury's opinion is as good as the witness's." United States v. Rodríguez-Adorno, 695 F.3d 32, 39 (1st Cir. 2012) (internal quotations and citation omitted).

Díaz-Arias contends that Trooper Cepero's opinion was just as good as the jury's because Trooper Cepero had never spoken with Díaz-Arias in person. Furthermore, the testimony in question went directly to the ultimate issue: it asserted that Díaz-Arias was the speaker in the recordings, thus identifying him as the guilty party and leaving no room for the jury to draw its own conclusions as to what the evidence established. The government, for its part, argues that Trooper Cepero's testimony was helpful to the jury because, as a native Spanish speaker who is familiar with the intonations and accents of people from the Dominican Republic, Trooper Cepero possessed particularized knowledge which may have proven helpful to a reasonable juror in making a voice comparison of a native Spanish speaker. The government calls our attention to United States v. Ayala, No. 09-CR-0138, 2010 WL 3369686, at *2 (N.D. Okla. Aug. 24, 2010), where the district court for the Northern District of Oklahoma allowed the lay opinion testimony of an interpreter who made a voice identification of a Spanish speaking defendant.

We agree with the government that, in this particular case, Trooper Cepero's testimony should have proven useful to the

jury in identifying Díaz-Arias' voice.  Given the fact that the wiretapped conversations were in Spanish, the district court did not abuse its discretion by determining that the jury may not have been able to <u>readily</u> draw the inferences and conclusions necessary to identify Díaz-Arias' voice, in the absence of Trooper Cepero's testimony.  Díaz-Arias can point to no evidence that this particular jury, sitting in Massachusetts, possessed the same mastery of the Spanish language as did Trooper Cepero, who is a native speaker familiar with the particular accents, intonations and speaking habits of persons from the Dominican Republic.[6] Lacking this background, the jurors were in a less advantageous position than Trooper Cepero was in making the voice comparison, as they would have had trouble understanding the words being spoken amongst the speakers and telling their voices apart.  This, in turn, would have hampered their efforts to detect how specific words were being repeated and vocalized by the speakers, to the detriment of their efforts to make a voice comparison.

The jurors also benefited from Trooper Cepero's guidance in making their voice identification because Trooper Cepero testified as to the particularities they should look for, including the speaker's unique intonation of certain words, greetings and

---

[6]  It is irrelevant that Trooper Cepero had never spoken with Díaz-Arias prior to trial, as the helpfulness of his testimony centers upon his fluency in the Spanish language, and not on any contact he may have had with Díaz-Arias beforehand.

laughter.  Trooper Cepero was able to derive these indicators thanks to the significant amount of hours he was able to devote, before trial, to listening to and comparing the voices of Hipólito and Díaz-Arias.  In this regard, Trooper Cepero's testimony may have actually saved time for the jury.

We conclude that Trooper Cepero and the jurors were not in the same position when it came to comparing the voices in the recordings, and therefore, the jury could have found the trooper's testimony to be helpful.

### 3.  Personal Experience

Federal Rule of Evidence 701 also requires that lay opinion testimony be "rationally based on the witness's perception." Fed. R. Evid. 701(a).  Díaz-Arias argues that Trooper Cepero's testimony failed to comport with this requisite, because Trooper Cepero allegedly based his identification of Díaz-Arias' voice on information that was relayed to him from the other agents working on the case.  Specifically, Díaz-Arias claims that Trooper Cepero testified that he "coordinated" with the other agents in the case and read their reports.  Because Trooper Cepero never spoke to Díaz-Arias in person, the argument goes, Trooper Cepero's lay opinion was not based on personal knowledge, but rather resulted from the overall investigation.

We have repeatedly warned that "prosecutors should not permit investigators to give overview testimony, in which a

-18-

government witness testifies about the results of a criminal investigation, usually including aspects of the investigation the witness did not participate in . . . ." United States v. Rosado-Pérez, 605 F.3d 48, 55 (1st Cir. 2010). Such testimony improperly exposes the jury to conclusory statements that are not based on the witness' personal knowledge, and which are unreliable because they often consist of inadmissible hearsay evidence derived from other government agents who participated in the investigation, but who were never brought to testify at trial. See Flores-De Jesús, 569 F.3d at 19 (stating that, when a government witness expresses his opinion as to a defendant's culpability based on the overall results of an investigation, "these conclusory statements often involve impermissible lay opinion testimony, without any basis in personal knowledge, about the role of the defendant in the conspiracy.").

We are satisfied that Trooper Cepero's voice identification testimony was squarely based on his personal knowledge. Díaz-Arias claims that, during cross-examination, Trooper Cepero admitted that he worked with the other agents participating in the investigation and read their reports. However, Trooper Cepero never said that his identification of Díaz-Arias' voice was based on the contents of those reports or on his interactions with the other agents, and Díaz-Arias' counsel did not follow up on this line of questioning by asking Trooper Cepero

-19-

whether he had in fact based his opinion on outside evidence. Rather, a review of the testimony reveals that Trooper Cepero adequately based his testimony on the knowledge he developed from personally listening to, and analyzing, the recorded telephone conversations of "Hipólito," as well as the stipulated audio recordings containing exemplars of Díaz-Arias' voice.[7] If a proper foundation is laid establishing the basis of a government lay witness' knowledge, opinion or expertise, then such a witness may testify about matters within his personal knowledge and give lay or, if qualified, expert opinion testimony. Rosado-Pérez, 605 F.3d at 56. This was clearly done in this case, as the prosecutor properly authenticated Trooper Cepero's voice identification testimony, by having him testify at length about (1) the procedures that were used to intercept and record the relevant phone conversations; (2) his experience handling wiretap investigations; (3) his fluency in the Spanish language as a native speaker from Puerto Rico who is familiar with the accents and intonations of

---

[7] Díaz-Arias' reliance on our decision in Vázquez-Rivera, 365 F.3d at 361, is misplaced, because in that case, the government had asked the government witness who the investigation had identified as the culpable party, and the witness answered that it was the defendant. We held that such testimony was improper under Rule 701 because the agent had never personally heard or observed the defendant; instead, the agent based her testimony on the combined perceptions of others. This is not the case here, as Trooper Cepero testified that he was familiar with Díaz-Arias' voice due to the hours he spent listening to the admitted recordings, and based his voice identification testimony on his own perceptions of those recordings.

individuals from the Dominican Republic; (4) his familiarity with the voices present in the recordings, given the extent of his preparation before trial in listening to them; and (5) the particularities he looked for in comparing the voices present in the recordings.

Therefore, we conclude that the voice identification testimony was properly authenticated pursuant to Federal Rule of Evidence 901, and that the content of this testimony was squarely based on Trooper Cepero's personal knowledge.

## 4. Lay vs. Expert Opinion

Díaz-Arias' fourth challenge is that the district court erred in allowing Trooper Cepero's voice identification testimony as it did not comply with the requirements of Federal Rule of Evidence 702, which governs the admission of expert witness testimony. Specifically, he complains that the government attempted to portray Trooper Cepero as an expert in voice identification, by having him testify about his fluency in the Spanish language and his familiarity with the accents of Spanish speakers from the Dominican Republic. However, apart from this impression, Díaz-Arias makes no attempt to explain how the trooper's familiarity with the Spanish language constituted the type of "specialized knowledge and heightened sophistication normally associated with expert testimony." United States v. Espinal-Almeida, 699 F.3d 588, 614 (1st Cir. 2012) (ellipsis

omitted).  Neither does he elaborate on how the methods used by Trooper Cepero in making the voice comparison were unreliable or how he was prejudiced by the district court's decision to allow the testimony as lay, instead of expert, opinion.  See United States v. Hilario-Hilario, 529 F.3d 65, 72 (1st Cir. 2008)("to succeed in obtaining a reversal on appeal, a defendant must prove both an abuse of discretion and prejudice.") (citing United States v. Álvarez, 987 F.2d 77, 85 (1st Cir. 1993), cert denied, 510 U.S. 849 (1993)).

In addition, these arguments are irrelevant to the issues presented by Trooper Cepero's testimony identifying Díaz-Arias as the speaker in question.  During cross-examination, Trooper Cepero clearly admitted that he was not an expert in voice identification, and stated that the jury had as much expertise as he did in voice recognition.  Further, at the close of evidence, the district court reminded the jurors that they were not obligated to accept his testimony, and that they could disregard it if they concluded it was unreliable or inadequately supported.  As a result, we cannot conclude that the jurors were misled into thinking that Trooper Cepero was an expert witness and that they needed to accord any undue deference to his testimony.  Accordingly, we find no abuse of discretion here.

## 5.  Factual Inconsistencies

Díaz-Arias' final challenge to the admission of the voice identification testimony is that the testimony was factually flawed.  He makes the case that, in the recordings of the wiretapped conversations, Hipólito represented that he was facing certain events and circumstances in his life which are directly at odds with the events and circumstances surrounding Díaz-Arias' life in 2004.  Firstly, he notes that in the recordings, Hipólito identified himself as being age 34 and that he was born in the month of April.  Conversely, Díaz-Arias claims he is 41 years of age and that his birthday falls on January 29.  Secondly, he notes that in the recordings, Hipólito made reference to the "sacrifices" he was making for "Angie," who presumably was his daughter.  Díaz-Arias now claims that the evidence at trial revealed that he only had three children, none of whom were named "Angie."  Thirdly, on one of the calls, Hipólito mentioned that he had not been able to see a certain woman, because she had put a restraining order on him, and that this, in turn, had prevented him from seeing his oldest daughter, whom he had raised.  Díaz-Arias argues that the recording does not identify the woman as Jacqueline Fresa, that the government did not elicit testimony from Fresa going to her efforts to impede Díaz-Arias from seeing his oldest daughter, and that Fresa's oldest daughter was in fact fathered by a man named Jason Pina, which makes it extremely unlikely that Díaz-Arias would have

been the one that raised her. Lastly, Díaz-Arias contends that the speaker in the recordings was not clear on whether he had one or more daughters with the woman he spoke about.

Having thoroughly reviewed the record, including Díaz-Arias' smorgasbord of aliases and liaisons, we are convinced that a reasonable jury may still have elected to credit Trooper Cepero's testimony, despite these seeming inconsistencies. In fact, many of the inconsistencies cited by Díaz-Arias are not inconsistencies at all. First of all, the Presentence Report (PSR) lists Díaz-Arias as having been born on January 29, 1971. In the summer and fall of 2004, Díaz-Arias would have been 33 years old, turning 34 the following year. In his brief, he states that he is 41 years old, but that probably refers to his age in 2012, when the brief was written. That said, there is a valid question as to the month of his birthday, January vs. April, but the record in this case establishes that Díaz-Arias was an avid user of false identities, which allowed him to assume several false dates of birth. Therefore, a reasonable jury would have acted well within in its discretion in concluding that Díaz-Arias was merely being untruthful when he asserted that he "was 34 years old as of April." It was also free to surmise that Díaz-Arias' true date of birth was not conclusively established at trial.

Likewise, Díaz-Arias' assertion that he only had three daughters, none of whom were named "Angie," is unsupported by the

record.  First of all, the record indicates that it was Fresa, and not Díaz-Arias, who testified that she only had three daughters, two with Díaz-Arias and one with Jason Pina.  Second, having reviewed the pertinent transcripts, it is apparent to us that Hipólito never explicitly stated that he had procreated "Angie" with the woman who placed the restraining order against him, and whom the government argued was Fresa.  Hipólito only appeared to mention that he had raised "Angie" and that the woman in question had taken her away from him.  Third, there was evidence that Díaz-Arias had romantic relationships with other women, and so the jury could have inferred that "Angie" was another one of Díaz-Arias' daughters, procreated with someone other than Fresa.  In fact, the PSR noted that Díaz-Arias reported having four other children, including two with Angie Christo, one of his former girlfriends. In any case, it is difficult to argue that the reference to "Angie" could have created any reasonable doubt within the minds of the jurors while evaluating the sufficiency of the evidence against Díaz-Arias.

We are similarly unpersuaded by Díaz-Arias' remaining arguments, to the effect that the recordings did not identify Fresa as the woman who had placed the restraining order against him.  The content of the recorded phone conversations, Fresa's testimony, and the admission of the restraining order itself (which was filed only a few days before Hipólito referred to it in the recordings) as

well as the other evidence presented at trial, comprised enough circumstantial evidence for the jury to conclude that it was Fresa who filed the restraining order against "Hipólito." Any uncertainty as to the amount of children Hipólito had with Fresa is minimal compared to the corroborating circumstantial evidence presented at trial, which strongly indicated that Hipólito was indeed Díaz-Arias. Moreover, it is the prerogative of the jury to "choose between varying interpretations of the evidence." United States v. Sánchez-Badillo, 540 F.3d 24, 32 (1st Cir. 2008)(citing United States v. Wilder, 526 F.3d 1, 7 (1st Cir. 2008)); see also United States v. Rodríguez-Durán, 507 F.3d 749, 758 (1st Cir. 2007) ("The government need not succeed in eliminating every possible theory consistent with the defendant's innocence . . . and circumstantial evidence alone may be sufficient to provide a basis for conviction." (internal quotations and citations omitted)); United States v. Martínez, 922 F.2d 914, 923 (1st Cir. 1991)("The evidence need not exclude every reasonable hypothesis inconsistent with guilt, and the jury is entitled to choose among varying interpretations of the evidence so long as the interpretation it chooses is a reasonable one.").

Based on the foregoing, we find that the district court did not abuse its discretion in allowing Trooper Cepero's voice identification testimony.

### B. Labeling of Transcripts

Díaz-Arias' second argument is that the district court abused its discretion when it allowed the government to provide the jury with transcripts of the intercepted phone conversations which identified one of the speakers by his first name, i.e. Hipólito.

### 1. Background

On July 25, 2011, Díaz-Arias filed a motion in limine aimed at precluding the government from introducing the transcripts of the wiretapped conversations it prepared, because one of the speakers was labeled as "Hipólito." After hearing arguments, the district court ruled that the transcripts could be used as the government proposed, "with the caution to the jury that it's a point the government has to prove, not only to identify who the speaker is but that, in fact, it is the defendant."

At trial, Díaz-Arias requested a limiting instruction when the government began playing the recorded telephone calls and providing the jury with the transcripts. The district court imparted the following instruction:

> Let me just tell the jurors that the government's labeled these conversations, and the transcripts have been prepared, obviously, from their point of view as to who the speakers are and what their names are and so on and so forth. Ultimately, that's your judgment to make, whether those people are who are actually recorded on the matter to the extent it's important. Particularly, the person identified as Hipólito. You'll have to decide if there was such a person and, ultimately, the question will be whether that

> was the defendant or not, or somebody else.
> But because the government has labeled it as
> "Hipólito" doesn't mean that that's
> determinative. You will make the determination
> at the appropriate time.

The jury was allowed to use the transcripts several times in order to follow along whenever the government played a recording of an intercepted telephone call. The jury was also provided with a copy of the transcripts to use during their deliberations.[8] Díaz-Arias now reiterates his objections to the use of the transcripts before this forum.

## 2.  Standard of Review

We review for abuse of discretion the district court's decision to allow the use of a transcript at trial. United States v. Anderson, 452 F.3d 66 (1st Cir. 2006).

## 3.  Analysis

Díaz-Arias mainly advances three arguments regarding the admissibility of the contested transcripts: (1) that there was no compelling evidence supporting Trooper Cepero's identification of him as one of the speakers; (2) that the district court did not properly instruct the jury that it was up to them to decide whether the speaker labeled as "Hipólito" was indeed Díaz-Arias; and (3)

---

[8]  Díaz-Arias lodged a continuing objection to the use of the transcripts at trial. He also objected to the government's request to provide the jury with the transcripts for their deliberations. The district court overruled both objections.

-28-

that labeling one of the speakers as "Hipólito" constituted impermissible vouching by the government.

The first two arguments are derived from Díaz-Arias' reading of our decision in United States v. Jadlowe, 628 F.3d 1 (1st Cir. 2010). In Jadlowe, the district court admitted the lay opinion testimony of a police officer identifying the defendant's voice in several recordings of wiretapped communications. 628 F.3d at 24. The defendant had argued that it was error to admit such testimony, because the identification was not based on the officer's prior personal experience with him, and because the jury "was perfectly capable of drawing its own independent conclusion[s] based on the evidence presented." Id. (internal quotations omitted). We agreed with the defendant that it was error for the district court to admit as lay opinion testimony the voice identification of the officer, because the officer was "not in a better position than the jurors to make the identity judgments." Id. We also agreed with the defendant that the district court erred when it allowed the prosecution to furnish the jury with the transcripts of the recorded conversations, because the transcripts reflected the officer's identification of the defendant's voice by labeling one of the speakers with his name. However, since the record established that there was "compelling circumstantial evidence that Jadlowe was properly identified as the speaker in the calls" and the district court providently instructed the jury that

it was up to them to make a determination as to whether the transcripts accurately identified the speaker as Jadlowe, we held that any error in admitting the lay opinion testimony and allowing the transcripts was harmless. Id. at 25.

Díaz-Arias claims that, contrary to Jadlowe, the circumstantial evidence pointing to him as the speaker in the phone call recordings was not compelling, and that while the district court did give the jury an instruction as to the use of the transcripts, this instruction was not given at the time that the transcripts were provided to the jury. Díaz-Arias' arguments, however, are misplaced, because the situation in Jadlowe is completely distinguishable from the one present in this case. The centerpiece of our holding in Jadlowe, as it pertained to the use of the transcripts, was that the officer's testimony identifying Jadlowe as one of the speakers was not helpful to the jury, because the evidence the officer relied upon to make that assessment was readily available to the jury. Id. at 24. Instead, here one of the speakers in the transcript was labeled with the name "Hipólito" based on Trooper Cepero's identification of Díaz-Arias as said speaker, and as we have already explained, Trooper Cepero in this case was in a better position than the jury to make that assessment, based primarily on his mastery of the Spanish language and his familiarity with the accents of native speakers.

Therefore, Díaz-Arias' attempts to frame his arguments within the context of our holding in <u>Jadlowe</u> are unavailing.

In any event, we agree with the government that there is sufficient evidence to establish that the speaker in the intercepted telephone conversations was someone named "Hipólito," and that "Hipólito," in turn, was the defendant, Díaz-Arias. There is strong circumstantial evidence that the speaker in question was referred to as "Hipólito" by the other members of the Pinales organization when they communicated with each other over the phone. For example, on the night of July 11, 2004, Pinales told Pena to call Hipólito the next day so that Pena and Hipólito could meet. A minute after that conversation took place, Pena called Hipólito to ask if he could visit him. On September 28, 2004, Hipólito called Pinales to inform him that "tomorrow, I am going to send the guy over there" and the next day, Hernández called Pinales and identified himself as "Hipólito's guy." Later that day, Pinales called a phone number and asked to speak with "Hipólito," after which he spoke with the speaker in question. Apart from Trooper Cepero's admissible testimony identifying the speaker as "Hipólito," there was enough circumstantial evidence here to support the labeling of the transcript with the name "Hipólito."[9]

---

[9]  In addition, two of the phone numbers used by Hipólito during the intercepted telephone calls were listed in Pinales' address books as belonging to "H.P.," which a reasonable juror could infer is an abbreviation for Hipólito.

The same can be said about the government's theory that Hipólito was the defendant, Díaz-Arias. As we have previously recounted, a reasonable jury could have concluded that Fresa was the woman Hipólito referred to in the tapes, given the ample evidence connecting the two. This evidence, coupled with Trooper Cepero's testimony that he was able to match the voice of "Hipólito" with the voice of Díaz-Arias, the latter of which he was able to discern from stipulated recordings of Díaz-Arias' voice, is enough to support the jury's conclusion that the voice of Hipólito belonged to Díaz-Arias.

The record also belies Díaz-Arias' second argument, that the district court did not properly instruct the jury that it was up to them to decide if the speaker labeled as "Hipólito" was in fact Díaz-Arias. As previously recounted, the district court did give the jury such an instruction when the government began playing the audio recordings of some of the intercepted calls. This instruction was given at the behest of Díaz-Arias' counsel. The district court again reminded the jury that the labeling of the transcripts was not determinative when it gave its concluding instructions, stating that "it is the government's position that the person referred to in . . . the transcripts of the intercepted telephone conversations as Hipólito is this defendant. To convict the defendant, the government must convince you of that fact beyond a reasonable doubt." We thus find that the district court

sufficiently instructed the jury that it was up to them to decide whether the speaker in question was Díaz-Arias.

Lastly, we are similarly unswayed by Díaz-Arias' third argument, that permitting the transcript to identify the speaker in question as "Hipólito" constituted improper governmental vouching.

Improper vouching occurs when prosecutors place the prestige of the United States behind one of their witnesses "by making personal assurances about the credibility of [that] witness or by indicating that facts not before the jury support [that] witness' testimony." United States v. Rosario-Díaz, 202 F.3d 54, 65 (1st Cir. 2000). Improper vouching can also be said to occur when a prosecutor implies to the jury that they "should credit the prosecution's evidence simply because the government can be trusted." United States v. Castro-Davis, 612 F.3d 53, 66 (1st Cir. 2010) (citing United States v. Pérez-Ruiz, 353 F.3d 1, 9 (1st Cir. 2003) and Flores-De Jesús, 569 F.3d at 18). We fail to see how any vouching took place with regards to the district court's allowance of the impugned transcripts. In his appellate brief, Díaz-Arias cites to some of our case law on the vouching doctrine, but fails to explain how the situations in those cases -- of government witnesses and prosecutors improperly bolstering the credibility of other government witnesses -- are mirrored in this case. Neither can we find any evidence on the record to suggest that the prosecutor improperly implied to the jury that they should take the

-33-

transcript at its word that the speaker in question really was "Hipólito," simply because the government and Trooper Cepero could be trusted to speak the truth. On the contrary, the government properly authenticated the transcripts via Trooper Cepero's testimony, and the labeling of those transcripts with the name "Hipólito" merely memorialized a part of that testimony: the identification of the speaker in question as a man named "Hipólito." Therefore, we reject Díaz-Arias' claims of improper vouching.

Consequently, we find no abuse of discretion in the district court's decision allowing the jury to use the transcripts. However, notwithstanding our validation of the evidence in this case, we suggest that in future cases it would be better practice for the government to establish the basis for the labeling of the transcripts, before these documents are initially presented to the jury, in addition to the court instructing the jury as was done by the district court in this case.

### C. Admission of Unrelated Drug Seizures

Díaz-Arias' third claim of error is that, while the indictment charged him with participating in a single, overarching conspiracy with the other twelve co-defendants, the evidence marshaled at trial indicated the existence of multiple independent conspiracies. Specifically, Díaz-Arias maintains that he was only "one of [the] many customers" of the Pinales organization, and that

he only entered into a limited conspiracy with two of the co-defendants (presumably Pinales and Heredia) to purchase cocaine from them, and not into the broader conspiracy charged in the indictment. Because of this, Díaz-Arias contends that the district court erred when it allowed the government to introduce evidence pertaining to the seizure of a kilogram of cocaine from Tajh White on September 27, 2004, as well as the seizure of 53 kilograms of cocaine from the stash house stewarded by Heredia at 115 Navarre Street. He claims this caused an impermissible variance to result at trial, which fomented an evidentiary spillover that allowed the jury to transfer the guilt of the other co-defendants to him, thereby abridging his "substantial rights." The following is a brief overview of the law in this regard.[10]

To sustain a conviction for conspiracy under 21 U.S.C. § 846, the government must establish that "(1) a conspiracy existed; (2) the defendant had knowledge of the conspiracy; and (3) the defendant knowingly and voluntarily participated in the conspiracy." United States v. Maryea, 704 F.3d 55, 73 (1st Cir. 2013) (citing United States v. Dellosantos, 649 F.3d 109, 116 (1st Cir. 2011)). The third element requires a showing that the defendant intended to join the conspiracy and also intended to effectuate its objectives. Id. A tacit agreement to join the

---

[10] Díaz-Arias also seems to challenge the drug quantity attributable to him in this section. For the sake of clarity, we will address said issue in the final section of this opinion.

conspiracy is sufficient.  United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999).

A prejudicial variance may result when "(1) the facts proved at trial differ from those alleged in the indictment; and (2) the error affects the defendant's substantive rights. . . ." Maryea, 704 F.3d at 73 (citation omitted).  The question of whether the evidence supports the existence of a single conspiracy is a factual one for the jury to determine.  United States v. Escobar-Figueroa, 454 F.3d 40, 48 (1st Cir. 2006).  Assuming the jury was properly instructed on this matter, something which Díaz-Arias does not challenge here, the initial question boils down to "one of evidentiary sufficiency."  Dellosantos, 649 F.3d at 116.  On review, we frequently regard the totality of the circumstances when evaluating whether the evidence proffered at trial suffices to establish the overarching conspiracy.  Pérez-Ruiz, 353 F.3d at 7. We must reject Díaz-Arias claims that a variance occurred if a "plausible reading of the record supports the jury's implied finding that he knowingly participated in the charged conspiracy." Id.

After carefully reviewing the record in this case, we first conclude that there was abundant evidence for the jury to determine that Díaz-Arias entered into a conspiracy to distribute cocaine. The evidence showed that Díaz-Arias purchased multiple kilograms of cocaine from the Pinales organization on several

occasions.  See, e.g., United States v. Mitchell, 596 F.3d 18, 23 (1st Cir. 2010)("pattern of drug sales between individuals for redistribution supports conclusion that individuals were involved in drug conspiracy." (citing United States v. Moran, 984 F.2d 1299, 1303 (1st Cir. 1993))).  It also established, as reflected in the wiretap recordings, that Díaz-Arias arranged for drug transactions with the core members of the conspiracy using the conspiracy's coded language.  Mitchell, 596 F.3d at 24 ("use of drug code probative of membership in conspiracy" (citing United States v. Morales-Madera, 352 F.3d 1, 12-13 (1st Cir. 2003))).  The drug ledgers also indicated the Díaz-Arias was a recurrent customer of the Pinales organization and that, at one point, he was indebted to the organization by more than $50,000.  Id. ("drug ledger, containing nicknames of defendant and other conspiracy members, is direct evidence of membership in conspiracy." (citing United States v. Tejada, 886 F.2d 483, 487 (1st Cir. 1989))).[11]

---

[11]  In Mitchell, we rejected a similar argument made by one of Díaz-Arias' co-defendants.  596 F.3d 18.  Marcus Mitchell, who was tried separately from Díaz-Arias, also argued that the evidence was insufficient to establish his participation in the conspiracy, although he did so as part of his challenge against the district court's decision to admit wiretap recordings as co-conspirator statements.  See Fed. R. Evid. 801(d)(2)(E).  We rejected his argument and found that the government had "offered substantial evidence . . . to establish that Mitchell was an active conspiracy member," by a preponderance of the evidence. Mitchell, 596 F.3d at 24.  The evidence used against Mitchell was substantially the same as that used against Díaz-Arias, except that a co-defendant, Oscar Rodríguez, testified at Mitchell's trial as a government witness. Id.

There was also a sufficient evidentiary foundation for the jury to determine that a single conspiracy existed. In conducting our inquiry as to this issue, several factors are of use, including: "(1) the existence of a common goal, (2) interdependence among participants, and (3) overlap among the participants." Dellosantos, 649 F.3d at 117. No single one of these factors, standing alone, is necessarily determinative. Sánchez-Badillo, 540 F.3d at 29. As to the common goal requirement, we have found it satisfied when the goal is to sell cocaine for profit or to further the distribution of cocaine. Portela, 167 F.3d at 695; Dellosantos, 649 F.3d at 117. Interdependence concerns "whether the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme." United States v. Ciresi, 697 F.3d 19, 27 (1st Cir. 2012) (internal quotation omitted). The final factor, overlap among the participants, can be found to exist when the conspiracy features "the pervasive involvement of a single core conspirator, or hub character." Dellosantos, 649 F.3d at 118 (internal quotation omitted).

Here, Díaz-Arias seems to argue that the evidence introduced at trial established the existence of multiple, independent drug trafficking conspiracies instead of the single, overarching conspiracy described in the indictment. He claims that while all the defendants had the purpose of profiting from the

distribution of cocaine, "that objective was achieved by different methods of operation, at different places, and with different people," which, according to him, suggests there was no interdependence between the parties. Although Díaz-Arias admits he received his supply of cocaine from Pinales, he contends the evidence did not establish that either of them believed that the success of the distribution operation depended on the ventures of the remaining eleven defendants. He also argues there was no evidence presented at trial indicating that he had any interactions with the other members of the conspiracy, thus reflecting a lack of overlap between them.

Since it appears that Díaz-Arias concedes the conspiracy had the common goal of selling and distributing cocaine for profit, we address the remaining two factors: whether overlap and interdependency existed among the participants of the conspiracy. The overlap factor is easily established, as the government proved that Díaz-Arias' supply of cocaine came directly from Pinales and Heredia, who spearheaded the organization. Hence, Pinales and Heredia neatly fit into the roles of core conspirators or hub characters of the conspiracy.

As to interdependency, we are not convinced by Díaz-Arias' argument that there was no interdependency because his co-defendants, who also purchased cocaine in wholesale quantities from the Pinales organization, were independent criminals whose criminal

activity was unforeseeable to him. It is well established that the government does not need to prove that the defendant knew all of the details of the conspiracy, nor that he participated in every aspect of the conspiracy. Sánchez-Badillo, 540 F.3d at 29. It also does not have to show that the defendant knew of or had any contact with each and every one of the conspirators. Id.

Further, in United States v. Soto-Beníquez, we stated that an example of interdependence is when "the success of an individual's own drug transactions depends on the health and success of the drug trafficking network that supplies him . . . ." 356 F.3d 1, 19 (1st Cir. 2003). This is readily apparent here, where the evidence established that Díaz-Arias was a repeat customer of the Pinales organization, purchasing multiple kilograms of cocaine, often on consignment, and regularly paying down debts, amounting to thousands of dollars, to the organization. A rational jury could have inferred that the proceeds the organization obtained from customers such as Díaz-Arias allowed it to continue importing large quantities of cocaine, thus furthering the criminal enterprise. Therefore, it can be said that Díaz-Arias' success as a distributor was predicated upon the success of the other co-conspirators; were it not for the combined collective effort of all of them, the Pinales organization would have faltered, possibly leaving Díaz-Arias bereft of a supplier. See Maryea, 704 F.3d at 77 ("This interdependence makes it reasonable to speak of a tacit

understanding between [a core conspirator] and others upon whose unlawful acts his success depends.") (internal quotation marks omitted). Accordingly, there was sufficient evidence for a jury to infer interdependency, and thus the existence of a single conspiracy.

Having determined that there was sufficient evidence to support the existence of a single conspiracy, we must also determine that the district court did not err in admitting the evidence from the cocaine seizures of Tajh White and Heredia's stash house. The evidence proffered by the government tended to establish that White was also a customer of the Pinales organization and that the stash house at 115 Navarre Street was used by that organization as a repository for cocaine. Therefore, the evidence stemming from the cocaine seizures were plainly relevant to proving the existence of the charged conspiracy. See Fed. R. Evid. 401.

### D.  The Race and Ethnicity Instruction

Díaz-Arias has also lodged an objection to the district court's refusal to provide the jury with his requested instruction on race, ethnicity and national origin. The requested instruction stated the following:

> It would be improper for you to consider, in reaching your decision as to whether the government sustained its burden of proof, any personal feelings you may have about the defendant's race or ethnicity, or national

origin, or his or any witness' immigration
status.

The district judge declined to give this instruction,
stating "I don't think I will give that specifically. I will
emphasize that they are to be completely fair-minded and impartial
and not to be influenced by private views of any of the instances
in the case, but I won't be any more specific than that." Instead,
the court opted to charge the jury with the following instruction:

> You should determine what facts have been
> shown or not based solely on a fair
> consideration of the evidence. That
> proposition means two things, of course. First
> of all, you'll be completely fair-minded and
> impartial, swayed neither by prejudice, nor
> sympathy, by personal likes or dislikes toward
> anybody involved in the case, but simply to
> fairly and impartially judge the evidence and
> what it means.

In his brief, Díaz-Arias points to surveys which "have
established that large portions of the community believe that drug
trafficking is more prevalent amongst Hispanics than it is with any
other ethnic group." He also provides citations to other studies
which have indicated that: (1) Blacks and Hispanics are more likely
to be incarcerated for drug offenses than are Caucasians; and (2)
the correlation between race and drug activity is a popular
misconception. Therefore, Díaz-Arias contends his proposed
instruction was necessary to dispel any notion among the jurors
that being Hispanic in and of itself is evidence of guilt in a drug
crime. By not giving the instruction, he argues, the district

court diminished the burden of proof and "allowed a misconception to infect the jury trial process." He contends the district court's lapse in this regard constituted reversible error. We reject that contention.

Properly preserved challenges to jury instructions are reviewed de novo, "taking into account the charge as a whole and the body of evidence presented at trial." United States v. Sampson, 486 F.3d 13, 29 (1st Cir. 2007). A district court's refusal to provide a requested instruction is reversible error only when the requested instruction "(1) was substantively correct; (2) was not substantially covered elsewhere in the charge; and (3) concerned an important point in the case so that the failure to give the instruction seriously impaired the defendant's ability to present his defense." United States v. Willson, 708 F.3d 47, 54-55 (1st Cir. 2013). "Cases satisfying all three [of these] factors are 'relatively rare.'" Id. (quoting United States v. González, 570 F.3d 16, 21 (1st Cir. 2009)).

In this case, Díaz-Arias' instruction fails to surmount the second prong of the test. The district court adequately instructed the jury that it should be "completely fair-minded and impartial, swayed neither by prejudice, nor sympathy, by personal likes or dislikes toward anybody involved in the case . . . ." Díaz-Arias' proposed instruction was a more specific version of the court's instruction; it merely recited the possible forms of

-43-

prejudice that a person might have against Díaz-Arias: race, ethnicity, national origin or immigration status.[12] The court's instructions effectively incorporated the essence of Díaz-Arias' request; they advised the jurors that they could not be swayed by any form of prejudice towards anybody involved in the case, which obviously included the defendant. See United States v. Rose, 104 F.3d 1408, 1416 (1st Cir. 1997) ("[T]rial court's charge need not use the exact wording requested by the defendant so long as the instruction incorporates the substance of the defendant's request."); United States v. McGill, 953 F.2d 10, 12 (1st Cir. 1992) (similar); Calhoun v. Acme Cleveland Corp., 798 F.2d 559, 564 (1st Cir. 1986) (holding that instruction to jury to "avoid bias or prejudice" was sufficient, despite defendant requesting an "anticorporate bias" instruction). Thus, the district court's decision to use a general term such as "prejudice," without listing the examples of concern to Díaz-Arias, does not constitute reversible error.

Our conclusion here is also based upon a number of factors. We first note that a plurality of the Supreme Court has stated that "[t]here is no constitutional presumption of juror bias either for or against members of any particular racial or ethnic groups." Rosales-López v. United States, 451 U.S. 182, 190

---

[12] The proposed instruction also referred to "the defendant," while the court's instruction referred to "anybody involved in this case."

(1981). Although Díaz-Arias expresses a concern in his brief as to one or more of the jury members possibly bringing "to the process some bias or just some inkling that the drug problem in this country is created by the presence of Hispanic's [sic] in our society," nothing in the record supports such an assertion. The district court docket reflects that Díaz-Arias was able to propose voir dire questions that went directly to the issue of prejudice on account of race, ethnicity, national origin and immigration status. Díaz-Arias has not argued before us that the district court refused to ask the venire those questions, or that the venire members who ultimately served as jurors demonstrated signs of harboring any kind of prejudice towards him. Neither can he point to any incident during the proceedings which would have given rise to a heightened concern of potential bias in any of the jurors.

Díaz-Arias' reliance on cases such as Miller-El v. Dretke, 545 U.S. 231 (2005) and United States v. Casas, 425 F.3d 23 (1st Cir. 2005), is also misplaced. While the Court in Miller-El did reaffirm that "racial discrimination by the State in jury selection offends the Equal Protection Clause," 545 U.S. at 238, there are no allegations in this case that the prosecutor discriminatorily used her peremptory strikes against venire members on account of their race or ethnic background. In Casas, on the other hand, we did warn that "[w]hen a non-frivolous suggestion is made that a jury may be biased or tainted by some incident, the

district court must undertake an adequate inquiry to determine whether the alleged incident occurred and if so, whether it was prejudicial." 425 F.3d at 48 (quoting United States v. Gastón-Brito, 64 F.3d 11, 12 (1st Cir. 1995)). However, Casas concerned an incident during trial where it was discovered that some of the jurors may have been biased in favor of certain defendants. Here, in contrast, Díaz-Arias has not alleged that any incidents took place during the course of the proceedings which may have called into question the impartiality of the jurors. Furthermore, we emphasize that Díaz-Arias did not inform the district court of his belief that some of the jurors may have been prejudiced against him; much less did he provide the court with any evidence to support such a claim, as he attempts to do on appeal. Accordingly, we see no legal basis to find reversible error in the district court's decision to forgo using the requested instruction.[13]

### E. Drug Quantity Determination

The fifth claim of error broached by Díaz-Arias in this appeal concerns whether the district court erred in refusing another of his proposed jury instructions, one that would have

---

[13] Our decision does not foreclose the possibility that, on facts not presented here, we would take up and reconsider the issue in the future. While the surveys and studies cited by Díaz-Arias present legitimate concerns, the record does not reflect that the jurors in this case were afflicted with the kind of bias said studies point to. In addition, we are confident the district courts will remain vigilant when it comes to detecting possible signs of jury bias, particularly during the jury selection stage of the proceedings.

asked the jury to determine the drug quantity attributable to him. The district court, however, opted to instruct the jury that "proof of the quantity of cocaine is not an issue for you to determine." Díaz-Arias now contends that the drug quantity finding should have been made by the jury beyond a reasonable doubt, not by the district judge by a preponderance of the evidence. He invokes the Supreme Court's landmark case of Apprendi v. New Jersey, 530 U.S. 466 (2000), to argue that his sentence was imposed in violation of his rights under the Fifth Amendment's Due Process Clause as well as the Sixth Amendment's notice and jury trial guarantees. Since Díaz-Arias preserved this claim at sentencing, we review his challenge to the constitutionality of his sentence de novo. See United States v. Brown, 669 F.3d 10, 19 (1st Cir. 2012).

The Supreme Court in Apprendi established the principle that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490; United States v. Malouf, 466 F.3d 21, 25 (1st Cir. 2006). The Apprendi principle, however, does not apply to facts that increase the mandatory minimum sentence. Harris v. United States, 536 U.S. 545, 557 (2002); Malouf, 466 F.3d at 25. In United States v. Goodine, 326 F.3d 26, 33 (1st Cir. 2003), we emphasized that "[a] sentencing court may use the preponderance of the evidence standard to find facts that require the imposition of

-47-

a specified <u>minimum</u> sentence, so long as that sentence does not exceed the maximum sentence provided by the relevant statute." (emphasis in original). Hence, the principle established in <u>Apprendi</u> is not breached if the district judge finds that a specific quantity of drugs can be attributed to a defendant -- thereby increasing the mandatory minimum sentence involved -- as long as that mandatory minimum sentence remains at or below the statutory maximum sentence that could be applied against the defendant given the jury's verdict. <u>United States</u> v. <u>Platte</u>, 577 F.3d 387, 392 (1st Cir. 2009); <u>United States</u> v. <u>Barnes</u>, 244 F.3d 172, 177-78 (1st Cir. 2001). The <u>Apprendi</u> principle will not be transgressed as long as the district judge does not impose a sentence above that statutory maximum sentence.

In this case, the indictment charged the defendants with violating sections 841(a)(1) and 846 of Title 21 of the United States Code, by conspiring with each other to possess with intent to distribute, and to distribute, at least five kilograms of cocaine. At trial, the government did not seek to have the jury determine whether the drug quantity attributable to Díaz-Arias was at least five kilograms of cocaine. Instead, the government agreed that if the jury decided to convict Díaz-Arias, it would not seek a sentence in excess of 20 years, which is the default statutory maximum sentence for crimes involving the distribution of cocaine in any quantity. <u>See</u> 21 U.S.C. § 841(b)(1)(c) (2006). Given the

-48-

jury's verdict finding Díaz-Arias guilty of the crimes charged, the maximum sentence that could have been applied against him was 20 years. Id. Subsequently, at sentencing, the district court found by a preponderance of the evidence that five or more kilograms of cocaine were attributable to Díaz-Arias and it imposed the mandatory minimum sentence contained in section 841(b)(1)(A)(ii), that is, ten years. Therefore, since the imposed sentence of ten years is not in excess of the default statutory maximum sentence of 20 years, Díaz-Arias' Apprendi-based attack on the constitutionality of his sentence fails. See Goodine, 326 F.3d at 33 ("If the disputed fact (here, drug quantity) influences the sentence, but the resulting sentence is still below the default statutory maximum, there is no Apprendi violation.").

## F. Sentencing

Lastly, Díaz-Arias takes issue with the district court's finding that more than five kilograms of cocaine were attributable to his participation in the conspiracy. He notes that the district court arrived at that estimate by relying on several pieces of evidence: (1) the single kilogram seized from Hernández on September 29, 2004; (2) a recording dated July 11, 2004, where Díaz-Arias supposedly discussed another kilogram; (3) the amounts shown on the seized drug ledgers from the Park Avenue Market; and (4) several proffer statements made by two of Díaz-Arias' co-defendants, Pinales and Rodríguez, who entered into cooperation

agreements with the government.  Although Díaz-Arias admits that the kilogram seized from Hernández could arguably be tied to him, he claims that the remaining pieces of evidence are insufficient to establish, by a preponderance of the evidence, that he was involved with five or more kilograms of cocaine.  He argues that the July 11, 2004 recording does not contain any explicit mention of a kilogram of cocaine, that no reliable evidence was introduced to discern the meaning of the numbers contained in the drug ledgers, and that the proffer statements should not have been relied upon because they violated his Confrontation Clause rights under the Sixth Amendment.  We proceed to analyze his claims.

When sentencing a member of a drug conspiracy, the district court must make an individualized finding "concerning the quantity of drugs attributable to, or reasonably foreseeable by," that member. United States v. Cintrón-Echautegui, 604 F.3d 1, 5 (1st Cir. 2010). In making that determination, the court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." Id. at 6 (quoting United States v. Zapata, 589 F.3d 475, 485 (1st Cir. 2009)).

Since Díaz-Arias objected to the district court's drug quantity calculation at sentencing, we review any legal error committed by the district court de novo, while mindful that factual

findings must be reviewed for clear error.  United States v. Ortiz-Torres, 449 F.3d 61, 72 (1st Cir. 2006).  If we can discern no legal error, then we must credit the district court's factual findings as to drug quantity "unless, on the whole of the record, we form a strong, unyielding belief that a mistake has been made."  Platte, 577 F.3d at 392 (quoting Cumpiano v. Banco Santander Puerto Rico, 902 F.2d 148, 152 (1st Cir. 1990)).  Here, we find that the district court's determination as to drug quantity was sufficiently grounded on reliable evidence.

At the outset, we must reject Díaz-Arias' claim that the use of the proffer statements subscribed by Pinales and Rodríguez violated his rights under the Confrontation Clause, because we have repeatedly stated that such rights do not attach during sentencing.  See United States v. Dyer, 589 F.3d 520, 532 (1st Cir. 2009); United States v. Luciano, 414 F.3d 174, 178-80 (1st Cir. 2005).  In these proffer statements, Pinales and Rodríguez described the role of Díaz-Arias within the drug organization, with Pinales stating that Díaz-Arias picked up a kilogram of cocaine from him every 15 days.  The proffers of Rodríguez seemed to be more inconsistent; at first he stated that he "possibly" delivered two kilograms to Díaz-Arias, as well as another undetermined amount, to two of Díaz-Arias' couriers.  However, a few months later, Rodríguez stated that he met Díaz-Arias three or four times and delivered six or seven kilograms to him.  In any event, despite this inconsistency,

Díaz-Arias does not separately challenge the reliability of these proffers; he has only assailed the district court's consideration of these statements under the Confrontation Clause. Moreover, the district judge made clear that he did not view the proffer statements in isolation, but rather as part of the information available to him as a whole, and that he did not take those statements as "gospel."

It is clear to us that the proffer statements, coupled with the amounts contained in the drug ledgers and the rest of the evidence presented a trial, adequately supported the district court's finding that Díaz-Arias was involved with five or more kilograms of cocaine. During trial, Trooper Cepero testified that, at the time of the conspiracy, a kilogram of cocaine generally sold for $23,000 to $24,000. The drug ledgers themselves suggested that someone with the initials "H.P." effectuated three transactions of $24,000 each, and one transaction amounting to $48,000. The ledgers gave the impression that once the transactions were made, "H.P." would proceed to amortize the resulting debts in various installments. Given the other evidence presented at trial, these ledgers could reasonably be read as reflecting the purchase of at least five kilograms of cocaine (three separately and two together), and that these sales were made on consignment. Furthermore, the district court did not commit clear error in concluding that "H.P." was Díaz-Arias, because in one of Pinales'

address books, introduced as Exhibit 23, there was a phone number ending in 1764 next to the initials "H.P." The wiretap investigation carried out by the DEA revealed that Díaz-Arias used that same phone number, among others, to communicate with Pinales.

Accordingly, we are not convinced by Díaz-Arias' arguments that the drug ledgers were too ambiguous for the district court to have arrived at a drug quantity determination of five or more kilograms. When considered alongside the other information contained in the PSR, including the proffer statements as well as the evidence produced at trial, the ledgers were sufficiently reliable to hold Díaz-Arias accountable for at least five kilograms of cocaine, as required to sentence him to the mandatory minimum of ten years under 21 U.S.C. § 841(b)(1)(A)(ii).

### III. <u>Conclusion</u>

For the reasons elucidated above, the judgment of the district court is affirmed.

**<u>Affirmed</u>**.